# EXHIBIT "B"

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION


- - - - - - - - - - - - - - - x
SARAH E. KRIEGER TRUST, ET AL., :  Docket No.: 2020-CAB-004714
                             :
      Plaintiffs,             :
                             :
      vs.                     :
                             :
REVIEW DEVELOPMENT, LLC, ET AL., :
                             :
      Defendants.            :
                             :  Monday, January 31, 2022
- - - - - - - - - - - - - - - x  Washington, D.C.

       The above-entitled action came on for a hearing

before the HONORABLE YVONNE M. WILLIAMS, Associate Judge, in

Courtroom Number 212.


           APPEARANCES:


           On Behalf of the Plaintiffs:

           ZACHARY L. CHAPMAN, ESQUIRE
           Washington, D.C.


           On Behalf of the Defendants:

           NO APPEARANCE


23-04005


www.escribers.net | 800-257-0885

1                              C O N T E N T S

2                                WITNESSES

3                          DIRECT   CROSS   REDIRECT   RECROSS

4

5    On behalf of the Plaintiffs:

6    Evan Sydney Klondar

7        by Mr. Chapman              4

8    Sarah Elizabeth Judith Krieger

9        by Mr. Chapman              15

10

11

12                            E X H I B I T S

13   NUMBER                    DESCRIPTION            ID'D   REC'D

14   On behalf of the Plaintiffs

15   1 - Contract                                            11

16   2 - Breakdown of cost estimates and payments made       12

17   3 - Report of defective work                            24

18

19                      M I S C E L L A N E O U S

20   COURT'S RULING                                          26

21

22

23

24

25

1                          P R O C E E D I N G S

2           THE DEPUTY CLERK:  Now I'm calling case number

3    2020 CA 4714 in the matter of Sarah Krieger Trust, et al.

4    versus Review Development, LLC, et al.

5           Parties, please state your names for the record.

6           MR. CHAPMAN:  Good morning, Your Honor.  This is

7    Zach Chapman.  I'm counsel for the plaintiffs in this

8    matter, Sarah Krieger, Trustee of the Sarah E. Krieger

9    Trust; Evan Klondar; and Sarah Krieger.

10          THE COURT:  Good morning.  All right.  So we're

11   here today for an ex parte proof hearing.  I did receive

12   your exhibits that seem to be the agreement that you had

13   with -- that the party had with Review Development for

14   renovations that were not completed.  So are you ready to

15   conduct your inquiry?

16          MR. CHAPMAN:  Yes, Your Honor.

17          THE COURT:  Are you going to speak with both or

18   one at a time?

19          MR. CHAPMAN:  Yes, Your Honor.  I can swear -- we

20   can swear both of them in at once.  They are going to

21   testify to separate topics, but I think it will be pretty

22   linear.  There won't be a long back and forth.  Once one of

23   them has completed their testimony, we'll move to the other,

24   and it will be limited to that.

25          THE COURT:  All right.  Well, we'll start with Ms.



1    Krieger.  Ms. Davenport, let's swear in Ms. Krieger.  If you

2    can raise your right hand, please.

3         (Witness sworn)

4         THE DEPUTY CLERK:  Thank you.

5         MR. CHAPMAN:  Your Honor, it might make more

6    sense, based on the topics, if we start with Mr. Klondar,

7    actually, if that would be okay.

8         THE COURT:  Oh, that's fine.  Let's swear in Mr.

9    Klondar.  If you can raise your right hand.

10        Thereupon,

11                    **EVAN SYDNEY KLONDAR**

12   having been called as a witness for and on behalf of the

13   Plaintiffs, and having been first duly sworn by the Deputy

14   Clerk, was examined and testified as follows:

15        THE COURT:  All right.  You may begin.

16        MR. CHAPMAN:  All right.  Thank you.

17                    **DIRECT EXAMINATION**

18        BY MR. CHAPMAN:

19    Q    Mr. Klondar, can you just state your name for the

20   record?

21    A    Yes.  Evan Sydney Klondar.

22    Q    And where do you live?

23    A    1419 S Street NW, in Washington, DC.

24    Q    Okay.  And can you just tell us, kind of give us a

25   background on how you learned about Review Development and

1   the other defendant, Jason Luttrell?

2       A    Yes.  So my wife and I purchased the property in

3   August of 2017.  At that time, we knew it needed some work

4   and some renovations, so we reached out to some architects.

5   We selected Jobi Jones as our architect and then asked her

6   who we should contact in terms of builders to do the actual

7   construction.  She gave us several names.  Review

8   Development and Jason, the defendants, were -- were two of

9   the -- were -- were -- one of the people we spoke to.  And

10  ultimately, on, sort of, her advice and speaking to

11  everyone, we selected them as the people to perform the work

12  on the property.

13      Q    Okay.  And was it your understanding that she had

14  done or worked on previous projects with Mr. Luttrell and

15  Review Development as well?

16      A    Yes, that's correct.

17      Q    And these projects were other renovations?

18      A    Yes, similar projects in size and scope to the

19  work we were having done at -- at our home.

20      Q    Okay.  And what kind of discussions were held

21  prior to entering into any sort of contract with Mr.

22  Luttrell and Review Development?

23      A    We discussed the size and scope of our project,

24  some of the work he had done similarly.  And I believe we

25  spoke to a reference that he had provided of somebody who he

1    had done work on at their home previously.  In addition, we

2    spoke to the nature of this work, just our -- our overall

3    working style, what we were looking for at the project, the

4    timelines, things like that.

5         Q    And did the cost of the project ever come up

6    during those discussions?

7         A    Yeah.  Yes, the defendant quoted us a -- a price

8    prior to signing the contract.

9         Q    Okay.  And did he make any representations

10   regarding his licenses and any of his abilities to perform

11   this type of work that would have been performed under the

12   contract?

13        A    He -- he -- certainly, the defendants said that

14   they were capable of performing the work, had performed

15   similar work in the past.  But there was no discussion of

16   licenses specifically, no, that I know.

17        Q    And did you rely upon his representations during

18   these conversations?

19        A    Yes.  Based on -- based on those discussions, we

20   believed that they were well qualified to do the work and

21   were -- were fully capable of taking on a project as we had

22   described it with them and discussed.

23        Q    Okay.  Did he point you to any social media or

24   marketing materials?

25        A    Yes.  There was the -- the -- we reviewed it on



1    the website, which had some pictures of previous projects

2    and, I think, as well perhaps Houzz or other website like

3    Profile (phonetic) that contained information about previous

4    work.

5        Q    Okay.  And did he provide you any sort of evidence

6    of insurance?

7        A    Not that I can recall, no.

8        Q    Did he ever provide you any sort of pamphlets,

9    such as an EPA lead certification or EPA renovate right's

10   letter?

11       A    No.

12       Q    Did he provide you with any DC Department of

13   Energy and Environment lead batch certification?

14       A    Not -- no, not that I can recall.

15       Q    Okay.

16            MR. CHAPMAN:  Your Honor, how do you want to do

17   exhibits?  I had sent them over -- the plaintiffs, my

18   clients, have in possession the exhibits that we're going to

19   use today.  Do you just want me to reference them?

20            THE COURT:  That's fine.  The exhibits you sent me

21   are not numbered, so --

22            MR. CHAPMAN:  Oh.  I think they're numbered at the

23   very bottom of the page.  So exhibit --

24            THE COURT:  Oh, I see.  Yep, they are.  Okay.  You

25   can just go forward.

1          MR. CHAPMAN:   Okay.

2          THE COURT:   Exhibit 1 is the contract and then --

3          MR. CHAPMAN:   Yes.

4          THE COURT:   Go ahead.   Uh-hmm, that's fine.   I

5    have them.

6          MR. CHAPMAN:   Okay.

7          BY MR. CHAPMAN:

8     Q     So Mr. Klondar, I'm just going to refer to what

9    has been pre-marked as Exhibit 1.   Do you have that document

10   in front of you?

11    A     I do, yes.

12    Q     Okay.   Can you just briefly describe what this

13   document is to us?

14    A     Exhibit 1 is the contract with Review Development.

15    Q     Okay.   And does that contract, did it ever include

16   Mr. Luttrell or Review's license number or anything like

17   that?

18    A     No, I -- I did not see a license number anywhere

19   within the document.

20    Q     Okay.   And what work was supposed to be performed

21   pursuant to this contract?

22    A     There were essentially three big blocks of work in

23   the contract and a bunch of smaller things.   The first was a

24   renovation of the kitchen in the home, just a -- basically a

25   total -- total renovation of the kitchen.

1          The second was a renovation of the primary

2   bedroom, including installing a walk-in closet and a

3   primary -- totally renovating the primary bathroom.  And

4   then there were, sort of, several other pieces of work on

5   the home, including, like, redoing the floors and updating a

6   powder room on the first floor of the house that were

7   included.  And then there's several other line items related

8   to those three big items in the contract.

9      Q    Okay.  And what was the original timeline for

10  completion for this contract?

11     A    Approximately five months was the initial

12  discussion.  The project was kicking off in November of 2017

13  and expected to conclude approximately five months later.

14     Q    Okay.  And generally, which -- you mentioned there

15  were three big projects that were supposed to occur under

16  the contract.  Do you recall the general timeline for each

17  project?

18     A    They -- they weren't really broken out separately.

19  It was all sort of one collective five-month effort.

20     Q    Okay.  And what specific work was actually done,

21  that you understand was done under the contract?

22     A    So in addition to those three items, as work

23  progressed on the house and demolition progressed, we were

24  made aware of some other issues with the house once they

25  were behind the walls.  So for instance, once they were

1  doing demolition in the primary bedroom, they noticed that

2  there had been some damage from a prior roof leak into the

3  beams in the ceiling.  And so Jason asked that we -- so he

4  recommended that we do a change order on the contract to

5  include work to repair and replace those rotted beams in the

6  ceiling.

7  In doing the work as well, the HVAC system became

8  a bit of an issue, so he recommended putting in and

9  replacing HVAC and ducting because so many of the walls had

10  already been sort of ripped out to deal with the roof issue.

11  As well, they -- the defendants recommended that because of

12  some issues at the rear of the home, the siding panels be

13  replaced as well as some electrical work be -- be completed,

14  sort of, to -- to tie out some of the challenges that --

15  that they were having throughout the house in -- in getting

16  electrical to run properly.

17  Q    Okay.  And then how long did the actual project

18  end up taking?

19  A    The work was never completed.  The defendants had

20  stopped responding to our messages by 2020.  And at that

21  point, there was still a significant amount of work

22  outstanding.  All the permits were still open.  There were

23  some -- some defects in -- in the workmanship that we were

24  working to have resolved.  And -- and that was ongoing at

25  that point.

escribers
www.escribers.net | 800-257-0885

1      Q    Okay.  And what was the original projected cost of

2   the project?

3      A    The original projected total cost was $138,520.

4      Q    Okay.  And did you end up paying Mr. Luttrell and

5   Review Development $224,710.80?

6      A    That's correct.  That's the total inclusive of all

7   the change orders and -- and other modifications.

8      Q    Okay.

9           THE COURT:  I'm sorry.  What was that total again?

10          MR. CHAPMAN:  $224,710.80.

11          THE COURT:  All right.

12          MR. CHAPMAN:  Okay.  Your Honor, after that, I'm

13   just going to move into evidence what's been pre-marked as

14   Exhibit 1.

15          THE COURT:  All right.  That will be admitted.

16                      (Plaintiffs' Exhibit Number 1 was

17                      received into evidence.)

18          MR. CHAPMAN:  Okay.

19          BY MR. CHAPMAN:

20      Q    Mr. Klondar, I want to show you what has been pre-

21   marked as Exhibit 2.  Can you just describe to me what

22   Exhibit 2 is?

23      A    Exhibit 2 is sort of the line-by-line breakdown of

24   the original cost estimates and payments made from those --

25   based on those invoices.

1    Q    Okay.  And these were invoices that were submitted

2  to you for payment from Jason Luttrell and Review

3  Development?

4    A    Yes, that's correct.

5    Q    And you ended up paying $224,710.80 over the

6  duration of the project?

7    A    Yes.  Between my wife and I, we paid -- we paid

8  that sum for a portion of the project.

9    Q    Okay.

10          MR. CHAPMAN:  Bless you.

11          THE COURT:  Thank you.  Sorry.

12          MR. CHAPMAN:  I'll now move into evidence what's

13  been pre-marked as Exhibit 2.

14          THE COURT:  All right.  Exhibit 2 will be

15  admitted.

16                        (Plaintiffs' Exhibit Number 2 was

17                         received into evidence.)

18          BY MR. CHAPMAN:

19    Q    And you kind of hit on this earlier, but just to

20  confirm, was the contract ever completed?

21    A    No, it was not.

22    Q    Okay.  And can you just briefly describe what work

23  was not completed?

24    A    Sure.  So all of the permits that were pulled for

25  the -- the work to be -- to be done combines with DCRA, none

1  of those were ever closed out, and so all of the work

2  required to close out those permits was outstanding.

3  Additionally, the work I mentioned on the back siding of the

4  home was not done properly, and so there was significant,

5  sort of, cosmetic defects happening because water was

6  getting behind the walls due to the way they were installed,

7  as was explained to us later.  So all of that needed to be

8  pulled off and new siding needed to be put on to replace

9  that.

10        In addition, there was a significant number of,

11  sort of, punch list items, paint things that weren't quite

12  right or fixtures that weren't installed quite properly that

13  just needed touched up.  And all those, sort of, minor

14  touch-up items were -- were left outstanding.

15     Q    Okay.  And you mentioned earlier that you paid to

16  have a new roof installed.  Was that new roof ever

17  installed?

18     A    Yes.  So -- so -- thank you, no.  So -- so what

19  happened was, we -- we paid -- again, Jason mentioned that

20  there was some damage to the -- to the roofing beams in the

21  house because of a leaky roof.  So one of the change orders

22  was to put a new roof on the home.

23        In approximately March of 2020, in a heavy

24  rainstorm, the roof leaked.  And so we called out a roofer

25  to figure out what the problem was, if something had -- had

1    happened.  And the roofer told us that we had not had a new

2    roof put on.  At that point, we contract -- contacted Mr.

3    Luttrell and, sort of, asked him to -- to put on a new roof.

4    He did send out a team to then do work to put on a roof,

5    which we were then told, after having someone else come out

6    and check the work, that it was done quite poorly, it was

7    not sealed properly, and that it was not really done in a --

8    a workmanlike manner.  And repairs were not economically

9    feasible based on the level of the workmanship, and so we

10   needed a second new roof put on to pull off the sort of,

11   defective one that was put on by that team.

12       Q    Okay.  And can you just generally describe how the

13   project ended?

14       A    Yes.  The -- the project ended, basically, with --

15   with the defendant no longer responding to our messages.

16   Periodically, every couple of weeks or so, we would -- I

17   would send a text message or give a call and say, hey, you

18   know, what's the status of the closeout?  Are you going to

19   be coming to -- to finish up the permits and the punch list?

20           And then sometimes, I wouldn't get a response.

21   Sometimes the response would be, he would -- or it will be a

22   few more weeks or whatever.  And that happened throughout,

23   basically, 2019 and into early 2020, at which point, there

24   was basically no more -- no more responses.  And some of the

25   workmanship issues were -- were becoming more apparent

1  and -- and he had stopped responding based on, sort of, our,

2  I think, increasing insistence that issues get resolved.

3      Q    So is it accurate to say that he abandoned the

4  project?

5      A    Yes.  That's how I would describe it.

6      Q    Okay.

7          MR. CHAPMAN:  Okay.  Your Honor, that's all I have

8  for Mr. Klondar.  I'm ready to move on to Ms. Krieger.

9  Thank you, Judge.

10         THE COURT:  All right.  Thank you, Mr. Klondar.

11  Ms. Krieger?

12         MR. KLONDAR:  Thank you, Your Honor.

13         THE COURT:  Remember, Ms. Krieger, you have been

14  sworn to tell the truth and nothing but the truth.

15         MS. KRIEGER:  Yes, Your Honor.

16         THE COURT:  Okay.  Thank you.

17      Thereupon,

18              **SARAH ELIZABETH JUDITH KRIEGER**

19  having been called as a witness for and on behalf of the

20  Plaintiffs, and having been previously sworn by the Deputy

21  Clerk, was examined and testified as follows:

22              **DIRECT EXAMINATION**

23         BY MR. CHAPMAN:

24      Q    Good morning, Ms. Krieger.  Can you state your

25  name for the record, please?

1      A     Yes.  My name is Sarah Elizabeth Judith Krieger.

2      Q     And where do you reside?

3      A     1419 S Street NW, S as in Sarah.

4      Q     Okay.  And that's in Washington, DC?

5      A     Yes.

6      Q     Okay.  Okay.  I want to talk to you generally

7  about the issues that resulted from the defendants' work to

8  the property.  Can you tell me when you learned that there

9  were issues with the work that was performed by the

10 defendants?

11     A     Yes.  So in approximately the fall of 2018, the

12 back siding of the home started bubbling and that's when we

13 realized there were some issues.  So we contacted the

14 defendant to fix that.

15     Q     Okay.  So this would have been prior to the

16 defendants abandoning the project?

17     A     Yes.

18     Q     Okay.  And what other concerns did you have with

19 the work that was performed?

20     A     Well, additional concerns popped up after we had

21 some additional -- or someone else come take a look at it

22 because the defendants did not come to -- to repair the

23 siding.  Initially, we called and said, you know, the

24 siding's bubbling.  Can you please come fix it?  Every time

25 it rains, there's -- more moisture's coming in.  So the

1   defendants came and repainted and said it was a paint issue.

2   But even after repainting, it continued to bubble.  And so

3   after our attempts to contact the defendants were

4   unsuccessful and we engaged another inspector and

5   contractors to come look at the house, we realized there

6   were significant additional defects in the work.

7        Q    Okay.  We'll get to that in a second.  Did the

8   defendants ever show you permits that were pulled for the

9   work?

10       A    Yes.  There were permits sitting in my front

11  window for several -- for a few years.

12       Q    Okay.  Did you believe that there were issues with

13  these permits?

14       A    At the time, I had no reason to doubt that they

15  were valid permits because I'm not an expert in this.  And

16  so I figured the permits had been pulled.  They were

17  prominently displayed in our front window.  And I didn't

18  think there was anything wrong with them at the time.

19       Q    Okay.  And did you learn later that they were not

20  accurate?

21       A    Yes.  I later learned that they were -- the term

22  "shadow permits" and that they were pulled as shadow

23  permits, and the people whose names were on the permits

24  didn't actually complete the work.  And in one case, the

25  name of the plumber, I believe, was deceased, so they -- it

1    was definitely -- that plumber was not performing work on

2    our house.  And I even -- I also later learned that some of

3    the permits were not pulled in our names as the homeowner.

4    They were pulled in the prior homeowner's names.

5        Q    Okay.  And did you later learn that much of the

6    work that the defendants performed was defective and done so

7    in an unworkmanlike manner?

8        A    Yes.

9        Q    Okay.  And can you tell me how you learned this?

10       A    Yeah.  So after we sought out a contractor to

11   evaluate the back siding and close out the permits, we

12   had -- we decided, just for our own piece of mind, after

13   learning that the back siding was not just paint, that we

14   would prefer to have the remainder of the work evaluated.

15   And there were several issues identified by the subsequent

16   contractor.

17       Q    And what were these issues?

18       A    So as we talked about, the roof was not properly

19   installed.  There was -- it didn't have flashing.  The

20   application itself was poor.  Fixing it was not really

21   economical, so we had to tear it off and replace it.  Again,

22   the permits were not closed out.  They were sitting open.

23   They eventually had to get reopened, and we had to pay for

24   that.

25           The HVAC system required some remediation as well.



1   There were also electrical and plumbing issues that were

2   outstanding.  The back stairs on the home were not properly

3   installed.  They were not to code.  They weren't sealed or

4   painted, so they were pretty much getting destroyed by

5   moisture and elements.

6          The siding that was bubbling had to be pulled off

7   because it was improperly installed and was allowing

8   moisture to seep in.  And then there were a lot of smaller

9   items throughout the house that were just cosmetic.  Some

10  were cosmetic.  Some were structural.  And a lot of code --

11  a lot of work was needed to be done to bring the house up to

12  code.

13      Q    All right.  I'm going to -- I want to show you

14  what's been pre-marked as Exhibit 3.  Do you have that in

15  front of you?

16      A    Yes, I do.

17      Q    Okay.  Can you describe to me what this is?

18      A    So this is a report that we had done when we

19  decided that we were uncomfortable with the amount of work

20  that -- the type of work that had been done, especially

21  after learning that the siding was done in an unworkmanlike

22  manner.  We had, again, for our own peace of mind, wanted a

23  second opinion on the remainder of the work to make sure it

24  was safe and up to code.  And so this is the report that we

25  had done to figure out what was going on with the rest of

 1  the work in the house and the general condition of the

 2  house.

 3      Q    Okay.  And does this report reflect that it would

 4  be estimated to cost $56,500 to cure the defects that were

 5  identified?

 6      A    Yes, it does.

 7      Q    And does this report reflect that these defects

 8  were -- stemmed from work that was performed by the

 9  defendants?

10      A    Yes.

11      Q    All right.  Is there anything else you want to

12  tell me about just some of the issues that you experienced?

13      A    I mean, it obviously has negatively affected our

14  ability to live in this house because we know that a lot of

15  the work that was done was unsafe and unworkmanlike.  And

16  it's been several years and a lot more money than we ever

17  anticipated spending.

18      Q    And did you have the work that was deemed

19  defective, did you have it cured by another contractor?

20      A    Yeah.  So we're actually still in the process of

21  having it cured.  The majority of it has been fixed, but

22  there still are some remaining items because of the

23  complexity of the work.  And since the walls are now closed

24  up, it's obviously a lot harder to fix issues behind the

25  walls.

1       Q     Okay.  And have you paid to date $67,268 to cure

2  the defective work that was performed by defendants?

3       A     Yes, we have.

4       Q     Okay.  And that's still ongoing, that you

5  mentioned earlier.

6       A     Yes.

7       Q     Okay.  Have you received any sort of estimate as

8  to how much additional costs you will have to incur to cure

9  the defective work?

10      A     Yes.  We've been told that it will be

11 approximately an additional $15,000.

12      Q     Okay.  And when did you learn that?

13      A     Last week, because we knew that we had some

14 additional work outstanding, and we wanted to be able to

15 explain what scope was out -- was left, still.

16      Q     And what scope is left, still?  What still needs

17 to be done?

18      A     There's still some electrical work that needs to

19 be completed because it turned out that we actually needed

20 to have a subpanel installed, which was another several

21 thousand dollars.  There's still some paint -- some -- we

22 need to seal -- so our home has an exposed brick wall, and

23 at the bottom of it, there are some wood pieces, which we

24 never knew what they were.  It turns out they are the wood

25 beams that support our -- we live in a row home.  They

escribers
www.escribers.net | 800-257-0885

1    support our neighbor's house with whom we share a wall.  So

2    in case of fire, if that catches fire, both of our homes

3    would go up.  So we needed to seal that with, like,

4    fireproofing molding.  So we're having that completed.

5           There's some balusters on the stairs that are --

6    they're mostly there for design, but, of course, you need to

7    have something there so no one falls through.  And they're

8    not sturdy.  So they had to be nailed in and painted and

9    closed out.

10      Q    Okay.  And did the defendants market themselves as

11   having significant experience in renovations of properties

12   like your property that's at issue in this case?

13      A    Yes.  The defendant made it seem like this was

14   just a matter of course, a typical project for him, that --

15   you know, that he was experienced in -- in doing -- that he

16   and the company had -- had done projects like this before,

17   that this was not an overwhelming or unreasonable ask.  And

18   most of the change orders were done at our behest, so they

19   were recommended by the defendant.  So we -- we sort of

20   trusted that these were things that the defendants knew

21   about.

22      Q    Okay.  And do you believe that these statements

23   were misleading?

24      A    Yes, I do.

25      Q    Why is that?



1      A      It became clear that although the defendants had

2   done renovation work, the size and scope of our project was

3   far beyond their -- their capability because they just

4   seemed overwhelmed.   They were not responsive.   Since we've

5   learned about all the unworkmanlike work that was done, it's

6   clear that they either weren't aware of what the code was or

7   didn't care about it.   Yeah, so it -- it's either -- either

8   the defendants overextended themselves and became involved

9   in too many projects and were unable to keep up with them,

10  or they had no idea what they were doing.

11     Q      Okay.   And is it accurate to say that the

12  defendants accepted payment for services prior to completion

13  of the contract or finishing the work?

14     A      Yes, they did.

15     Q      Did the defendants ever provide any sort of

16  specifications along with the agreement that you entered

17  into such as construction plans or anything like that?

18     A      No.   The plans that were used were actually

19  drafted by the architect.   So all the plans that we saw were

20  architectural, and there were no building plans that the

21  defendants came up with.

22     Q      So it's accurate to say that the defendants

23  performed their work strictly based off of the architectural

24  plans and not actual construction drawings?

25     A      Yes, that is correct.



1   Q Okay.  And we obviously hit on this earlier, but

2 the work that was performed by the defendants, it ended up

3 being defective?

4   A Yes, it did.

5   MR. CHAPMAN:  Your Honor, I'll move into evidence

6 now what was pre-marked as Exhibit 3.

7   THE COURT:  Okay.  Exhibit 3 will be admitted.

8       (Plaintiffs' Exhibit Number 3 was

9       received into evidence.)

10   BY MR. CHAPMAN:

11   Q Okay.  Are there any additional defects that you

12 care to mention that you're aware of, or have we kind of hit

13 on everything?

14   A I think we've hit on everything.

15   MR. CHAPMAN:  Okay.  I think that's all I have,

16 Your Honor.  I have included as an Exhibit 4 an attorney's

17 fee affidavit for myself indicating the amount of fees that

18 have accrued during the course of the litigation.  If you

19 want to hear testimony from Ms. Krieger or Mr. Klondar

20 regarding the amounts that they have paid, we can do that.

21 But the fee affidavit includes an exhibit of the billing

22 history that was done through this litigation.

23   THE COURT:  Yeah.  No, I see that.  I mean, I

24 just -- most of it -- much of it is redacted.

25   MR. CHAPMAN:  I can provide you an unredacted --



www.escribers.net | 800-257-0885

1          THE COURT:  Do you have an unredacted version?

2          MR. CHAPMAN:  I can provide -- my office can

3   provide that, Your Honor.

4          THE COURT:  If you could do that, that would be

5   great so that when I issue my order, I know exactly what it

6   is that the attorney's fees went to.

7          MR. CHAPMAN:  Would you -- would you -- can that

8   just be sent to your chambers directly, since there's

9   obviously --

10         THE COURT:  Yeah.

11         MR. CHAPMAN:   -- privileged information included

12   in that?

13         THE COURT:  Absolutely.  You don't have to file

14   it.  Just send it straight to chambers.

15         MR. CHAPMAN:  Okay.  Understood.

16         THE COURT:  And then I'll have it.

17         MR. CHAPMAN:  Okay.  Well, with that, Your Honor,

18   I think that concludes the testimony.  I would move for

19   judgment in the amount of $67,268 plus the $15,000 in

20   anticipated costs to cure the defects, which that is $82,268

21   for the -- regarding the negligence aspect of the case.  And

22   then for violation of the Consumer Protection Procedures

23   Act, $224,710.80.

24         THE COURT:  I'm sorry.  Say that again, 200 what;

25   220 --

1          MR. CHAPMAN:  $224,710.80.  That treble damages be

2    assessed pursuant to the CPPA in the amount of $674,132.40;

3    and then that attorney's fees and costs be awarded in the

4    amount of $47,029.52.  And then I also included -- I have

5    filed this morning, I just didn't know if the Court needed

6    it -- but Exhibits 5 and 6 that were included are military

7    affidavits confirming that the defendants are not in the

8    military.

9          THE COURT:  Okay.  No, I got those.  Thank you.

10         All right.  Well, I will find that -- I will enter

11   a default judgment against Review Development and the other

12   defendant, Jason Luttrell.  I will definitely order that the

13   $82,268 be paid, since those are the costs that have been

14   incurred -- or will be incurred and have been incurred with

15   respect to the repairs that need to be made based upon the

16   defendants' failure to meet the terms of the contract it

17   signed into with the plaintiffs.

18         And you're asking for $224,000 because they didn't

19   have a -- did they have a license, or do we have information

20   about that?

21         MR. CHAPMAN:  There was information provided

22   during discovery that they -- it appears that they had a

23   license, but much of the CPPA violations -- there were other

24   CPPA violations as well that are outlined in the complaint.

25         THE COURT:  Okay.  I'll order the $224,710.80.



1    Let me review the treble damages' question.  I know that

2    that is -- that's not mandated by the Consumer Protection --

3    the DC Consumer Protection Act.

4            MR. CHAPMAN:  Understood.

5            THE COURT:  So let me review the statute and

6    review the facts of this case.  I'll listen to the testimony

7    again so that I can see if it's warranted in these

8    circumstances.

9            Also, I will award attorney's fees, but I need to

10   know what I'm awarding and how much it's going to be.  So I

11   just need to get the actual figures --

12           MR. CHAPMAN:  Correct.  We will --

13           THE COURT:  -- so I can.

14           MR. CHAPMAN:  We'll send the unredacted version as

15   soon as this is over to your chambers.

16           THE COURT:  Okay.  Wonderful.

17           All right.  So I do enter a default judgment.  The

18   final number, I'll just need to review some things, and I'll

19   get the order out to you by the end of today or tomorrow.

20           MR. CHAPMAN:  Okay.  Thank you, Your Honor, so

21   much.

22           THE COURT:  All right.

23           MR. CHAPMAN:  Do you need anything else from us?

24           THE COURT:  No.  Thank you all very much.

25           MS. KRIEGER:  Thank you very much, Your Honor.

1          MR. CHAPMAN:  Thank you, Your Honor.

2          THE COURT:  All right.

3          (Thereupon, this concludes these proceedings.)

4                              * * * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  <u>CERTIFICATE OF TRANSCRIBER</u>

2         I, Tabitha L. Jones, transcriber, do hereby

3 certify that I have transcribed the proceedings had and the

4 testimony adduced in the case of SARAH E. KRIEGER TRUST, ET

5 AL. v. REVIEW DEVELOPMENT, LLC, ET AL., Docket Number:  2020

6 CAB 004714 in said Court, on the 31st day of January, 2022.

7         I further certify that the foregoing 28 pages

8 constitute the official transcript of said proceedings as

9 transcribed from audio recording to the best of my ability.

10         In witness whereof, I have hereto subscribed my

11 name, this 2nd day of October, 2023.

12

13

14

15                                    *Tabitha L. Jones*

16                                 TRANSCRIBER

17

18

19

20

21

22

23

24

25