## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: | ) |
| | ) |
| **JASON DANIEL LUTTRELL,** | ) |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |
| **SARAH E. KRIEGER TRUST, SARAH E. KRIEGER AND EVAN KLONDAR,** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| **JASON DANIEL LUTTRELL,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

**Case No. 23-00056-ELG**
**Chapter 7**

—Adv. Pro. No. —————**23-10020-ELG**

### **FIRST AMENDED** COMPLAINT (I) TO DETERMINE NON-DISCHARGEABILITY OF DEBT AND (II) OBJECTING TO DISCHARGE

Creditors Sarah E. Krieger, Evan Klondar and the Sarah E. Krieger Trust ("Plaintiffs"), pursuant to 11 U.S.C. §§ 523 and 727 and Rules 4004, 4007, 7001(4) and 7001(6) of the Federal Rules of Bankruptcy Procedure, for their complaint against defendant Jason Daniel Luttrell ("(the "Debtor" or "Luttrell") (i) seeking a determination that the debt owed by the Debtor to Plaintiffs is excepted from discharge and (ii) objecting to the entry of a discharge in the above-captioned bankruptcy case, allege as follows:

_____
Katie Lane Chaverri (DC Bar No. 502976)
Jeffrey Rhodes (DC Bar No. 456371)
Tayman Lane Chaverri LLP
2001 L Street NW, Suite 500
Washington, DC 20036
kchaverri@tlclawfirm.com (202-695-8146)
jrhodes@tlclawfirm.com (202-921-4080)

### Jurisdiction and Venue

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I) and (J).

4.    Plaintiffs consent to entry of final orders or judgment by the bankruptcy court.

### Parties

5.    Plaintiff Sarah Krieger is a natural person residing within the District of Columbia, and a creditor of the Debtor.

6.    Plaintiff Evan Klondar is a natural person residing within the District of Columbia, and a creditor of the Debtor.

7.    The Sarah E. Krieger Trust is a trust settled within the District of Columbia, and a creditor of the Debtor.

8.    Defendant Jason Daniel Luttrell is a natural person residing within the District of Columbia and the Debtor in the above-captioned case.

### Factual Background

9.    Review Development LLC ("Review") is a limited liability company organized under the laws of the District of Columbia in or about May 2012.  At all times relevant, the Debtor owned 100% of the membership interests in Review.  Review is an alter ego of Luttrell.

10.    On or about November 7, 2017, Plaintiffs entered into an agreement (the "Agreement") with Review for the renovation of real property located at 1419 S Street, NW, Washington, DC 20009 (the "Project").

11.    Prior to entering into the Agreement, the Debtor and Review made various representations regarding the Debtor's and Review's licensure extensive construction experience and their abilities that were false and that were relied upon by Plaintiffs.

12.   At the time the Agreement was executed, neither Debtor nor Review were licensed to provide the work described in the Agreement.

13.   The Agreement provides for a timeline of 2 to 16 weeks for completion of the Project and a total cost of $138,520.

~~14.~~12.   Over the life of the Project, ~~the cost ballooned to $237,038.60~~Plaintiffs discovered that several of the Debtor's representations were untrue when several significant defects in workmanship, many of which affected their safety, came to light.

~~15.~~13.   On December 2, 2018, Review sent a document titled "Project Invoice – Sub. Complete" detailing Review's false contention as to the status of the purported work completed and the then-existing payments.

~~16.~~14.   In 2019 and 2020 and continuing thereafter, Debtor and Review were in financial distress.

~~17.~~15.   In 2019 and 2020, Debtor and Review borrowed funds pursuant to short-term loans from merchant cash advance (MCA) lenders to fund operations.  Debtor would also receive transfers of funds from his mother to meet Review's payroll and other obligations.

~~18.~~16.   In or about February or March of 2020, while still managing and operating Review, Debtor took a part-time job working for AllenBuilt, Inc. ("AllenBuilt"), a general contractor and design/build firm operating in the Washington, D.C. metropolitan area.

~~19.~~17.   At the time he started working for AllenBuilt, Debtor held a personal bank account at Wells Fargo bank.  Although he had his own bank account, at Debtor's direction, AllenBuilt deposited all of Debtor's wages directly into a bank account solely owned by Debtor's wife, Annie Luttrell, who is not a co-obligor of the debts of Debtor or Review.

~~20.~~18.   On or about August 26, 2020, Michael Radkowski Raviv ("Raviv") filed a complaint against Debtor with the Consumer Protection Unit of the District of Columbia

3

Department of Consumer and Regulatory Affairs (the "DCRA") relating to a 2018 renovation project to be performed by Debtor and Review. The DCRA issued an investigative report stating that Debtor "walked off the job and did not complete it," and "refuses to return the deposit or complete the work."

21.19.    On or about November 12, 2020, the DCRA issued a Notice of Infraction to Debtor and Review for violations of D.C. Code §§ 28-3904(e) ("misrepresent as to a material fact which has a tendency to mislead") and 28-3904(n) ("cease work on, or return after ceasing work on, an electrical or mechanical apparatus, appliance, chattel or other goods, or merchandise, in other than the condition contracted for, or to impose a separate charge to reassemble or restore such an object to such a condition without notification of such charge prior to beginning work on or receiving such object"). Mr. Raviv would later file, on or about June 23, 2022, a complaint against Debtor in the Superior Court of the District of Columbia for damages arising from the 2018 project.

20.    When asked about DCRA fines during the meeting of creditors in this case, Debtor testified that a previous client had made a complaint, but that he (Debtor) could not remember what the fines related to.

22.21.    On November 17, 2020, Plaintiffs, by counsel, filed a *Verified Complaint* (the "Verified Complaint") against Debtor and Review in the Superior Court for the District of Columbia (the "Superior Court"), thereby commencing Case No. 2020-CA-004714-B (the "Superior Court Action"). A true and correct copy of the Verified Complaint is attached hereto as **Exhibit "A"**.

22.    The Verified Complaint alleged, *inter alia*, that the Debtor and Review made various false and fraudulent representations regarding the Debtor's and Review's licensure,

4

abilities, and performance that Plaintiffs relied upon. *See* Ex. A., Verified Complaint, ¶¶ 11-15, 24, 26, 31, 35-36, 41-44.

23.    On or about December 1, 2020, Classic Hardwood Floors Inc. filed a complaint against Debtor in the Circuit Court for Montgomery County, Maryland (the "Classic Hardwood Litigation"). Debtor did not defend the Classic Hardwood Litigation, and testified under oath that he contemplated filing bankruptcy after the Superior Court Action and Classic Hardwood Litigation were filed.

24.    On December 14, 2020, Debtor and Review, by counsel, filed in the Superior Court Action their *Answer, Affirmative Defenses and Counterclaim of Defendants Review Development LLC and Jason Luttrell* (the "Counterclaims").

25.    In early 2021, while the Superior Court Action was pending, Debtor and Review continued to be in financial distress. During this time, Review had serious cash flow problems and often had insufficient funds to cover checks written from its bank account.

26.    In early 2021, while the Superior Court Action and other litigation against him was pending and Review's business operations were in decline, Debtor stopped using his personal bank account at Wells Fargo, an account that he had held for almost two decades, and allowed the account to be closed. Although Debtor stopped using his personal Wells Fargo account and allowed it to be closed in 2021, he testified at the meeting of creditors in this case that the account was closed in 2019.

27.    After Plaintiffs filed the Verified Complaint in November 2020, the Debtor refused to comply with his discovery obligations and failed to produce personal and business records to Plaintiffs while during that same timeframe he was making extensive efforts to shield money from his creditors.

28.    Specifically, the Debtor caused Review to make numerous fraudulent transfers and fraudulent conveyances to accounts held exclusively by the Debtor's wife, and to pay his wife's debts from Review's Bank of America account.

29.    For example, only days after Review received $25,835.00 as part of the CARES Act Paycheck Protection Program on January 27, 2021, the Debtor, on February 4, 2021, directed Review to transfer $24,775.00 from its Bank of America account to a Charles Schwab bank account (the "CSB Account") held exclusively by the Debtor's wife.

30.    On March 23, 2021, April 4, 2021, April 14, 2021, April 28, 2021 and May 13, 2021, the Debtor fraudulently directed Review to transfer $18,523 over several transactions to pay down a Chase credit card held exclusively by the Debtor's wife.

31.    Between February and May of 2021, the Debtor caused several cash withdrawals from Review's Bank of America account in the aggregate amount of approximately $18,500 and has not explained where that money went or what it was used for.

32.    Between January and May of 2021, the Debtor fraudulently transferred approximately $45,000 from Square (also known as Block, Inc.) accounts he controlled to Review's Bank of America Account.

33.    These are only a few examples of conduct that demonstrates the Debtor's fraudulent intent and efforts to hinder, delay and defraud creditors.

27.34.  On January 4, 2021, Plaintiffs filed in the Superior Court Action (i) a motion to dismiss the Counterclaims filed by Debtor and Review, and (ii) a motion for partial judgment on the pleadings on Count I of the Plaintiffs' Verified Complaint for violation of the D.C. Consumer Protection Procedures Act.

28.35.  On January 19, 2021, Debtor and Review, by counsel, filed (i) an opposition to Plaintiffs' motion to dismiss Debtor's and Review's Counterclaims, and (ii) an opposition to Plaintiffs' motion for partial judgment on the pleadings.

29.36.  On February 17, 2021, the Superior Court denied Plaintiffs' motion to dismiss and motion for partial judgment on the pleadings.

30.37.  On March 3, 2021, Plaintiffs filed an answer to Debtor's and Review's Counterclaims.  Thereafter, the parties continued to litigate the Superior Court Action.

31.38.  On July 29, 2021, Jackie T. Meier, counsel for Debtor and Review in the Superior Court Action, Jackie T. Meier, filed a motion to withdraw as counsel of record.  On August 17, 2021, the Superior Court entered an order granting Ms. Meier's motion and authorized her withdrawal from the case.

32.39.  In or about June or July of 2021, while the Superior Court Action and other litigation against the Debtor was pending, the Debtor ceased operating Review.  At the meeting of creditors in this case, the Debtor testified that Review ceased operating in the middle of 2020 and that the last time the Debtor took a draw from Review was in 2019.

40.  However, documents Plaintiffs obtained during post judgment discovery demonstrate that the Debtor was still controlling Review's finances as of at least 2021.

33.41.  In or about September of 2021, while the Superior Court Action and other litigation against the Debtor was pending, Debtor took a position with Fajen & Brown, a home builder and renovator based in Hyattsville, Maryland.  At Debtor's direction, Fajen & Brown deposits Debtor's wages directly into a bank account solely owned by Debtor's wife, Annie Luttrell, who is not a co-obligor of the debts of Debtor or Review.

34.42.  On September 23, 2021, the Superior Court held a status hearing.  Neither Debtor nor Review appeared at the September 23, 2021 status hearing.  On September 24, 2021, the

Superior Court entered an order directing Debtor and Review to appear at a status hearing scheduled for October 22, 2021 or risk the entry of default judgment against them.

35.43.  The Superior Court held a status hearing on October 22, 2021, at which Debtor appeared pro se.  The Superior Court set the matter for "ascertainment of counsel" at a further status hearing scheduled for November 19, 2021.

36.44.  Neither Debtor nor Review appeared at the November 19, 2021 status hearing.  The Superior Court entered default against Debtor and Review in the courtroom at the November 19, 2021 hearing.

45.    On January 31, 2022, the Superior Court (Hon. Yvonne M. Williams) held an ex parte proof hearing on Plaintiffs' motion for default judgment.  and Plaintiffs Sarah Krieger and Evan Klondar appeared at, and gave sworn testimony as to the Debtor's fraudulent conduct and misrepresentations, Plaintiffs' reliance on the Debtor's misrepresentations, and how his lack of experience and shoddy workmanship caused them harm and put them in danger.  A true and correct copy of the transcript of the January 31, 2022 hearing, at which they is attached hereto as **Exhibit "B"**.

37.46.  Plaintiff Evan Klondar testified as to the Debtor's false oral and written representations that the Debtor and Review were sworn in and gave testimonycapable of performing the work and that he and Plaintiff Sarah Krieger relied on the Debtor's false representations that he and Review were fully qualified and capable of performing the services required for the project.

47.    On January 31, 2022, the Superior Court entered itsPlaintiff Sarah Krieger testified that replacement contractors and an inspector confirmed that much of the Debtor's work was not only defective and unworkmanlike, but that permits had not been closed out and several aspects of the work did not meet code.

48.    Referring to an inspection report Plaintiffs had submitted as an exhibit in support of the judgment, Ms. Krieger further testified that at least $56,000 of additional work would need to be performed to rectify the harm the Debtor had done to their property and to make the property code compliant.

49.    Ms. Krieger further testified that she discovered several of the permits the Debtor and Review had affixed to Plaintiffs' windows were illegitimate "shadow permits," that the contractors whose names appeared on those permits had not actually performed the work, and that in one instance, a named tradesman could not have performed the work because he was deceased.

50.    At the conclusion of the hearing, Plaintiff's counsel sought $82,268 to cure the workmanship defects and a separate amount of $224,710 80 for violation of various provisions of the District of Columbia Consumer Protection Act (specifically excluding the licensure issue as a basis for such award).

51.    At the January 31, 2022 hearing, Judge Williams ruled from the bench in favor of Plaintiffs with respect to $82,268 to cure the workmanship defects and $224,710 80 for violation of the District of Columbia Consumer Protection Act.

52.    Rather than ruling on treble damages and attorneys' fees, Judge Williams took those aspects under advisement, stating that she would need to review the statute, facts, and testimony to determine whether treble damages were warranted under the circumstances.

38.53. Later that day, Judge Williams entered an Order Granting Motion for Default Judgment (the "Judgment") in favor of Plaintiffs.  The Judgment awarded Plaintiffs damages for violation of the District of Columbia Consumer Protection Act based on representations by Debtor and Review that were false and relied upon by Plaintiffs in entering into the Agreement for the renovation Project.  Pursuant to the Judgment, theThe D.C. Superior Court awarded $555,012.80 to Plaintiffs, an amount that includesincluding actual and treble damages for violation of the

District of Columbia Consumer Protection Act, plus $47,029.52 for attorneys' fees and costs. A true and correct copy of the Judgment is attached hereto as **Exhibit "C."**

39.54.  Neither Debtor nor Review filed an appeal of the Judgment or a motion to alter or amend the Judgment, which is final and non-appealable.

40.55.  After the Judgment was entered, Plaintiffs sought post-judgment discovery from Debtor and Review.

41.56.  Debtor and Review actively sought to avoid responding to Plaintiffs' post-judgment discovery.  At one point, a bench warrant was issued for Debtor, and on September 30, 2022, the United States Marshalls arrested Debtor and brought him before the Superior Court for a Civil Bench Warrant Hearing.  Plaintiffs' efforts to obtain discovery from Debtor and review continued into early 2023.  Despite Plaintiffs' requests, the Debtor and Review failed and refused to produce all documents requested by Plaintiffs. including, by way of example and without limitation, all tax filings, contracts, financial statements, and documents concerning how Debtor was compensated by Review .  The limited bank and other records that Plaintiffs were able to obtain in the post-judgment discovery and in connection with this case reveal a complex pattern of transfers over the years among accounts owned by the Debtor, Annie Luttrell, Review, and the Debtor's mother, Sandra Luttrell.

42.57.  On February 18, 2023 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 7 of the United States Bankruptcy Code, thereby commencing the above-captioned bankruptcy case.

43.58.  From and after the closing of his personal Wells Fargo bank account in 2021 and continuing through the Petition Date, the Debtor caused his employers to deposit his wages directly into a Charles Schwab bank account (the "the CSB Account") owned solely by his wife, Annie Luttrell, who is not a co-obligor of the debts of the Debtor or Review.

44.59.  Although he is not an owner or holder of the CSB Account, the Debtor exercises control over the funds in the CSB Account and uses the funds in the account to pay his personal expenses.

45.60.  At a Rule 2004 examination in his bankruptcy case, the Debtor testified under oath that he has moved money from the CSB Account to a Charles Schwab brokerage account owned by his wife, Annie Luttrell, and that the Debtor has bought and sold stocks in the brokerage account.

46.61.  The Debtor failed to list in his Schedules any ownership interest in any stocks or in any brokerage account.

62.    At the meeting of creditors in this case, the Debtor testified that he owns an Apple watch, yet the Debtor failed to include that asset on his Schedules.

63.    In his Statement of Financial Affairs, the Debtor listed a legal action with Prince Funding, identifying the "nature of the case" as a "Judgment," but not indicating whether the status of the case was pending, on appeal, or concluded.  In his Schedule E/F, the Debtor listed an unsecured nonpriority claim of Prince Funding in the amount of $0.00, but provided no other information concerning the claim.

64.    At the meeting of creditors, the Debtor testified that the Prince Funding loan had not been paid off, that Prince Funding had sued the Debtor in a different state, although he was not sure which, and that he had no idea about the lawsuit or what transpired other than money being taken "right out of" a joint checking account he held with his mother at Wells Fargo.  The Debtor could not specify when this happened, but testified that this took place in "2021-ish."

47.65.  At his Rule 2004 examination, Luttrellthe Debtor testified that Prince Funding was an MCA lender that obtained a judgment against him "for some dollar amount," but the Debtor

was still unable to provide information about the amount of the judgment, the amount he borrowed from Prince Funding, or when he borrowed the funds.

48.66.  In his Schedule E/F, the Debtor listed a claim of the U.S. Small Business Administration based on an EIDL Loan in the amount of $75,000.  At the meeting of creditors in this case, the Debtor testified that the obligor on the EIDL Loan was Review, and that the Debtor did not personally guarantee the EIDL Loan.

49.67.  On or about August 18, 2021, Jackie T. Meier, the attorney who represented the Debtor and Review in the Superior Court Action, filed a claim against the Debtor and Review in the Superior Court of the District of Columbia for unpaid attorneys' fees in the approximate amount of $2,300 (the "Meier Claim").  Although the Debtor never paid the Meier claim and does not dispute that he owes money to the Meier Law Firm, the Debtor failed to disclose the Meier Claim in his Schedules.

50.68.  The Debtor resides in a home located in the District of Columbia that is solely owned by his wife, Annie Luttrell, and that is encumbered by a mortgage under which Annie Luttrell is the obligor.

51.69.  The Debtor is not an obligor on the mortgage encumbering the home owned by his wife, Annie Luttrell.

52.70.  In his Schedule J filed in this case, the Debtor claimed that his monthly rental or home ownership expenses for his residence is $1,500.00.  This statement is false, because as the Debtor testified at his Rule 2004 examination, the mortgage is paid from funds in the CSB Account.

## COUNT I

## DETERMINATION OF
## NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(2)(A)

53.71.  Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

54.72.  Section 523(a)(2)(A) provides, in relevant part, that a discharge under section 727 of the Bankruptcy Code does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

55.73.  The Debtor incurred debts to the Plaintiffs.

56.74.  The Debtor's debts to Plaintiffs were incurred by false pretenses, one or more false representations, or actual fraud.

57.  Prior to entering into the Agreement, Debtor represented that Debtor and Review were licensed to provide the work described in the Agreement, when at the time the Agreement was executed, neither Debtor nor Review were licensed to provide such work.

58.75.  Prior to entering into the Agreement, the Debtor and Review represented themselves to have significant experience in renovation projects such as the Project at issue.

59.76.  In connection with the marketing of their services to Plaintiffs, the Debtor and Review made material misrepresentations and material omissions.

60.77.  In entering into the Agreement, Plaintiffs justifiably relied on, and were damaged by, Debtor's knowing and intentional misrepresentations, including misrepresentations regarding his and Review's licensure experience and abilities.

61.78.  The Superior Court entered Judgment in favor of Plaintiffs and against the Debtor (and Review) for violation of the District of Columbia Consumer Protection Act based on representations by the Debtor and Review that were false and relied upon by Plaintiffs in entering into the Agreement for the renovation Project.

62.79.  Debtor's obligation to pay the Judgment is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

## COUNT II

### DETERMINATION THAT DEBTOR'S DEBTS ARE NOT DISCHARGEABLE PURSUANT TO 11 U.S.C. § 727(a)(2)(A)

63.80.  Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

64.81.  Within one year before the Petition Date, the Debtor transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed, property of the Debtor.

65.82.  Within one year before the Petition Date, the Debtor repeatedly caused his employer to deposit the Debtor's wages directly into the CSB Account owned solely by the Debtor's wife, Annie Luttrell.

83.      The Debtor designed this practice of placing funds beyond the reach of his creditors intentionally, as evidenced by the Debtor's history of causing his and Review's funds to be transferred to his wife's accounts during the years he and Review suffered financial distress.

66.84.  As of the dates of the transfers or removals of Debtor's property, the Debtor had one or more unsecured creditors, including Plaintiffs.

67.85.  The transfer or removal of Debtor's property prevented the distribution of Debtor's property to Debtor's unsecured creditors, including Plaintiffs.

68.86.  Upon information and belief, Debtor, with intent to hinder, delay or defraud one or more of his creditors, transferred or removed, or permitted to be transferred or removed, Debtor's property.

69.87.  By transferring or removing, or permitting the transfer or removal of, Debtor's property with the intent to hinder, delay, or defraud at least one of his creditors, Debtor violated the provisions of 11 U.S.C. § 727(a)(2)(A).

**COUNT III**

**DETERMINATION THAT DEBTOR'S DEBTS ARE NOT DISCHARGEABLE
PURSUANT TO 11 U.S.C. § 727(a)(3)**

70.88.  Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

71.89.  Upon information and belief, Debtor has failed to keep or preserve recorded information, including books, documents, records, and papers, relating to Review.

72.90.  At his Rule 2004 examination in this case, Debtor admitted that he has not kept or preserved all of Review's financial records, testifying that he has "a folder with financial documents in it" and "I don't think it's exhaustive by any extent."

73.91.  At the meeting of creditors and at a Rule 2004 examination in this case, Debtor was unable to provide specific information about certain of his financial affairs and made conflicting statements about his financial affairs, including when he closed his personal bank account and when Review ceased operations.

92.    Upon information and belief, the Debtor's and Review's records, if available to Plaintiffs, would reveal additional transfers made with the intent to hinder, delay or defraud the Debtor's creditors.

93.    Specifically, at the meeting of creditors, Debtor first testified that Review did not pay his personal expenses and, later on during the meeting testified that Review did not "regularly" pay his personal bills. When asked specifically about the Silverado listed on Debtor's schedules, Debtor further testified that Review had in fact paid the car payment as "a company expense."

15

94.     At the meeting of creditors, Debtor testified that Review ceased operations as of the middle of 2020, that the last time he took a draw from Review was 2019, and that the funds went into his personal Wells Fargo bank account.

95.     At the meeting of creditors, Debtor testified that the last time he had a personal bank account was 2019. However, when the Chapter 7 Trustee's counsel showed the Debtor a Wells Fargo bank statement during a Rule 2004 examination in this case Debtor testified that the personal bank account was "apparently" still active as of at least August 2020.

96.     At the meeting of creditors, Debtor testified that he started transferring his paychecks to his wife's bank account when he took a part time W-2 job with AllenBuilt in February or March of 2020 while he was still operating Review.

~~74.~~97.  The books, documents, records, and papers relating to Review that Debtor has failed to keep or preserve are books, documents, records, and papers from which Debtor's financial condition or business transactions might be ascertained.

~~75.~~98.  The Debtor's failure to keep or preserve recorded information, including books, documents, records, and papers, relating to Review is not justified under all of the circumstances of the case.

~~76.~~99.  By failing to keep or preserve recorded information, including books, documents, records, and papers, relating to Review, Debtor violated the provisions of 11 U.S.C. § 727(a)(3).

**COUNT IV**

**DETERMINATION THAT DEBTOR'S DEBTS ARE NOT DISCHARGEABLE
PURSUANT TO 11 U.S.C. § 727(a)(4)(A)**

~~77.~~100.      Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

78.101.        The Debtor signed his Schedules and Statement of Financial Affairs under penalty of perjury.

79.102.        The Debtor's Schedules and Statement of Financial Affairs contain false statements and omissions.

80.103.        At the meeting of creditors and at a Rule 2004 examination in this case, Debtor made conflicting statements about his financial affairs, including when his personal bank account was closed and when Review ceased operating.

81.104.        At a Rule 2004 examination in his bankruptcy case, Debtor testified under oath that he has moved money from the CSB Account to a Charles Schwab brokerage account owned by his wife, Annie Luttrell, and that Debtor has bought and sold stocks in the brokerage account.

82.105.        Debtor failed to list in his Schedules any ownership interest in any stocks or in any brokerage account.

83.106.        Although Debtor never paid the Meier claim and does not dispute that he owes money to the Meier Law Firm, Debtor failed to disclose the Meier Claim in his Schedules.

84.107.        Although Debtor testified at the meeting of creditors in this case that he is not personally obligated to the U.S. Small Business Administration for the EIDL Loan, he listed the debt in his Schedule E/F.

85.108.        Debtor failed to provide in his Schedules and Statement of Financial Affairs complete information concerning a judgment in favor of Prince Funding, including the date and amount of the judgment.

86.109.        Debtor's statement in Schedule J that he has monthly rental or home ownership expenses in the amount of $1,500.00 is false, because Debtor is not an obligor on the

mortgage encumbering the home owned by his wife, Annie Luttrell, and the mortgage is paid from funds in the CSB Account.

87.110.          By signing his Schedules and Statement of Financial Affairs under penalty of perjury that contained the false statements and omissions, and by making false statements at the meeting of creditors and the Rule 2004 examination in this case, the Debtor made a false oath or account in connection with the case.

88.    Upon information and belief, the Debtor's false oath or account made in connection with the case was made knowingly and fraudulently.

111.    The Debtor's whole pattern of conduct as described herein, including his orchestration of complex transfers between several accounts he controlled, and a series of false statements during the meeting of creditors, the Rule 2004 examination, and in his schedules and Statement of Financial Affairs demonstrate that these false oaths and accounts were material as to his financial condition and were made knowingly and fraudulently.

89.112.          By knowingly and fraudulently making a false oath or account in connection with the case, Debtor violated 11 U.S.C. § 727(a)(4)(A).

WHEREFORE, plaintiffs Sarah E. Krieger, Evan Klondar and the Sarah E. Krieger Trust pray for the entry of judgment against Jason Daniel Luttrell (i) determining that the Debtor's obligation to pay the Judgment is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (ii) denying Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A), 727(a)(3), and/or 727(a)(4)(A), (iii) awarding Plaintiffs attorneys' fees as allowable by law; (iv) awarding Plaintiffs costs of suit, and (v) granting Plaintiffs such other or further relief as just and appropriate.

Dated: July 28October 18, 2023                    **TAYMAN LANE CHAVERRI LLP**

                                                */s/ Jeffrey Rhodes*
                                                Katie Lane Chaverri (DC Bar No. 502976)
                                                Jeffrey Rhodes (DC Bar No. 456371)

Tayman Lane Chaverri LLP
2001 L Street NW, Suite 500
Washington, DC 20036
kchaverri@tlclawfirm.com (202-695-8146)
jrhodes@tlclawfirm.com (202-921-4080)

*Counsel to the Sarah E. Krieger Trust, Sarah E.*
*Krieger and Evan Klondar*

# EXHIBIT "A"

Filed
D.C. Superior Court
11/19/2020 00:10AM
Clerk of the Court

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

| | |
|---|---|
| SARAH E. KRIEGER TRUSTEE,<br>SARAH E. KRIEGER TRUST<br>1419 S Street, N.W.<br>Washington, D.C. 20009<br><br>and<br><br>SARAH E. KRIEGER<br>1419 S Street, N.W.<br>Washington, D.C. 20009<br><br>and<br><br>EVAN KLONDAR<br>1419 S Street, N.W.<br>Washington, D.C. 20009<br><br>     Plaintiffs,<br><br>v.<br><br>REVIEW DEVELOPMENT, LLC<br>Serve: Jason Luttrell<br>6322 5ᵗʰ Street, N.W.<br>Washington, D.C. 20011<br><br>and<br><br>JASON LUTTRELL<br>6322 5ᵗʰ Street, N.W.<br>Washington, D.C. 20011<br><br>    Defendants. | Civil Action No. **2020 CA 004714 B** |

**VERIFIED COMPLAINT**

Plaintiffs Sarah Krieger, Evan Klondar and the Sarah E. Krieger Trust (collectively, the

"**Plaintiffs**"), by and through undersigned counsel, respectfully file this Verified Complaint

1

against Review Development, LLC ("**Review**") and Jason Luttrell ("**Luttrell**") and aver as follows:

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to D.C. Code § 13-423.

2. Jurisdiction and venue are proper as the subject matter of this action relates to real property located within Square 0206, Lot 0005 and more commonly referred to as 1419 S Street, N.W., Washington, D.C. 20009 (the "**Property**").

3. Additionally, the injury and damages complained of occurred within the District of Columbia by actions of Review and Luttrell made within the District of Columbia.

## PARTIES

4. Sarah Krieger is a natural person residing within the District of Columbia.

5. Evan Klondar is a natural person residing within the District of Columbia.

6. The Sarah E. Krieger Trust is a trust settled within the District of Columbia.

7. Review is a District of Columbia limited liability company that is authorized to transact business within the District of Columbia.

8. Luttrell is a natural person residing within the District of Columbia.

## FACTS COMMON TO ALL COUNTS

9. On or about November 7, 2017, Plaintiffs entered into an Agreement (the "**Agreement**") with Review for the renovation of the Property.

10. A true and accurate copy of the Agreement is attached hereto as Exhibit 1.

11. Prior to entering into the Agreement, Review and Luttrell made various representations to Plaintiffs regarding defendants' licensure and their abilities which, while such representations were false, were relied upon by Plaintiffs.

2

12. At the time the Agreement was executed, neither Luttrell nor Review were licensed to provide the work described therein.

13. The Home Improvement Contractor ("**HIC**") License No. 4203-15000426 expired on August 31, 2017.

14.  The General Contractor/Construction Manager ("**GC/CM**") License No. 4105-15000602 commenced on September 1, 2019.

15. Neither a HIC nor a GC/CM License number is included on the Agreement, nor does the Agreement contain a copy of any license.

16. Neither Review nor Luttrell provided Plaintiffs with a copy of any evidence of insurance.

17. Neither Review nor Luttrell provided Plaintiffs with an EPA Lead Certification at the time of entering into the Agreement notwithstanding that the Property was constructed prior to 1978.

18. Neither Review nor Luttrell provided Plaintiffs with the EPA Renovate Rights.

19. Neither Review nor Luttrell provided Plaintiffs with evidence of a DC DOEE Lead Badge Certification notwithstanding that evidence of one is required for the project at issue.

20. The Agreement provides for a timeline of 12 to 16 weeks for completion and a total project cost of $138,520.00.

21. During the life of the project, the cost ballooned to $237,038.60.

22. To date, the project remains incomplete.

23. To date, Plaintiffs have paid $224,710.80 towards completion of the project.

3

24. On December 2, 2018, Review sent a document titled "Project Invoice – Sub. Complete" detailing Review's false contention as to the status of the purported work completed and the then-existing payments.

25. A true and accurate copy of the document titled "Project Invoice – Sub. Complete" is attached hereto as Exhibit 2.

26. Despite the substantial payments to Review, the Agreement was not properly performed and much of the work actually performed was done in an unworkmanlike manner and without proper permits.

27. On October 22, 2020—after a review of the then-existing status of the project—DC Building Plans & Consultants, LLC drafted a Renovation Project Status Report (the "**Status Report**") which identifies a number of defects in the project as well as defects in the manner and methods employed by defendants in regard to the project.

28. A true and accurate copy of the Status Report is attached hereto as Exhibit 3.

29. In order to complete the project, it is estimated that Plaintiffs will need to expend no less than $56,500.00, exclusive of attorneys' fees.

30. Luttrell has, and at all times relevant herein, has had, a controlling ownership interest in Review.

31. Luttrell has used the corporate form of Review to perpetrate a fraud or wrong as set forth herein.

32. Review is a mere alter ego of Luttrell.  To hold Luttrell and Review liable for the debts of the other would be both fair and just.

33. Review and Luttrell are liable, jointly and severally, for the acts of the other.

4

## COUNT I – D.C. CONSUMER PROTECTION PROCEDURES ACT

34. The foregoing paragraphs are incorporated herein by reference.

35. Review and Luttrell marketed themselves to have significant experience in renovations of property such as the Property at issue.

36. In connection with the marketing of their services, Review and Luttrell made misrepresentations and material omissions that had a tendency to mislead.

37. Review and Luttrell were and are each a "merchant" within the meaning of the D.C. Consumer Protection Procedures Act (the "CPPA").

38. Plaintiffs are each a "person" within the meaning of the CPPA.

39. Plaintiffs are each a "consumer" within the meaning of the CPPA.

40. Providing the services as set forth in the Agreement is a provision of "goods and services" within the meaning of the CPPA.

41. The making of representations and otherwise marketing such goods and services constitutes "trade practice" within the meaning of the CPPA.

42. By making representations, and by failing to adequately and properly renovate the Property, Review and Luttrell engaged in unlawful trade practices within the meaning of the CPPA.

43. Among the violations of the CPPA by defendants in addition to the above-described failure to possess proper licenses and misrepresentations regarding the quality of services to be provided include, but are not limited to: that the advertisements and Agreement fail to include defendants' license number (17 DCMR §§ 3904.1, 3905.1 and 3905.7 and 16 DCMR §§808.4 and 808.9); that defendants accepted payment notwithstanding that there exists no written agreement "in accordance with the provisions "of the municipal

5

regulations (17 DCMR § 3905.2, 16 DCMR § 811.1 and 16 DCMR § 808.1); there is no set of specifications included with the Agreement (17 DCMR § 3905.11 and 16 DCMR § 808.12); and, the required warnings are not set forth in the Agreement (17 DCMR § 3905.13 and 16 DCMR § 808.15).

44. Plaintiffs, acting for their own interests, and for the interests of the general public, are entitled, pursuant to D.C. Code § 28-3905(k), to bring this action seeking relief from Review's and Luttrell's unlawful trade practices.

WHEREFORE, Plaintiffs Sarah Krieger, Evan Klondar and the Sarah E. Krieger Trust respectfully pray that judgment be entered in their favor in the form of compensatory damages against Review Development, LLC and Jason Luttrell, jointly and severally, in an amount to be proven at trial of not less than $224,710.80; treble damages against Review Development, LLC and Jason Luttrell, jointly and severally; punitive damages against Review Development, LLC and Jason Luttrell, jointly and severally, jointly and severally, in an amount to be determined; costs, attorneys' fees, prejudgment and post-judgment interest against Review Development, LLC and Jason Luttrell, jointly and severally; and, any further amounts deemed just and proper by this Court.

## COUNT II – NEGLIGENCE

45. The foregoing paragraphs are incorporated herein by reference.

46. Review and Luttrell, as well as their respective agents, employees and contractors, had a duty to act to perform the above-referenced construction and renovation in a workmanlike manner.

47. Review and Luttrell, as well as their respective agents, employees and contractors, breached their duty by failing to act in a reasonable manner as set forth *supra*.

6

48. Review and Luttrell, as well as their respective agents, employees and contractors, caused damage to the Plaintiffs and the Property.

WHEREFORE, Plaintiffs Sarah Krieger, Evan Klondar and the Sarah E. Krieger Trust respectfully pray that judgment be entered in their favor in the form of compensatory damages against Review Development, LLC and Jason Luttrell, jointly and severally, in an amount to be proven at trial of not less than $56,500.00; punitive damages against Review Development, LLC and Jason Luttrell, jointly and severally, jointly and severally, in an amount to be determined; costs, attorneys' fees, prejudgment and post-judgment interest against Review Development, LLC and Jason Luttrell, jointly and severally; and, any further amounts deemed just and proper by this Court.

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

*/s/ Christopher A. Glaser*
Christopher A. Glaser (DC Bar No. 463583)
2300 N Street, N.W.
Suite 300
Washington, D.C. 20037
Telephone: (202) 457-1600
Facsimile:  (202) 457-1678
cglaser@jackscamp.com
*Counsel for Plaintiffs*

7

## VERIFICATION

I hereby certify that the facts stated in the above complaint are true and correct to the best of my knowledge, information and belief.

_Sarah Krieger_, Trustee of the Sarah E Krieger Trust

Sarah Krieger, Trustee of the Sarah E. Krieger Trust

_Sarah Krieger_

Sarah Krieger

_Evan S Klondar_

Evan Klondar

8

DocuSign Envelope ID: E40FE365-79FC-4694-8BE1-7CA96FC0D42A



## AGREEMENT

This Agreement is made this 7th day of November, 2017 between Review Development, LLC (hereinafter referred to as Review Development) located at 6322 5th St. NW, Washington DC, 20011 and the Owners, Evan Klondar and Sarah Krieger in connection with the renovation of the property located at 1419 S St. NW, Washington DC, (hereinafter referred to as "Project").

### SECTION ONE (Scope of Work)

Review Development will provide the Work as agreed upon in the architectural drawings by Jobi Jones, LLC. Review Development shall provide and pay for labor, materials, equipment, tools, construction, equipment and machinery, necessary for proper execution and completion of the Work. The Owner understands that costs in the estimate ONLY cover construction related materials. Electrical Fixtures - cabinets, tile, plumbing fixtures, electrical fixtures, etc must be procured by the Homeowner. Further, Review Development reserves the right to issue change order for items not included in the attached Scope of Work (see Section Six for details of Change Orders). If Review Development must pick-up materials, Review Development will bill the homeowner at $50.00 an hour to procure items outside of construction costs laid out in the Scope of Work. Building permit is to be obtained and paid in full by homeowner.

### SECTION TWO (Commencement of Work and Substantial Completion)

The substantial work for the Project shall begin in November 2017. Owners and Contractor will determine a start date in the coming weeks. Subject to authorized adjustments, the work will be substantially complete approximately 14-16 weeks from the commencement date of the Work. Substantially complete is defined as the space can be utilized for the purpose intended. The Owner agrees not to use or occupy any space where work has been completed until the Punch List Agreement has been signed by both parties. Review Development shall not be responsible for delays caused by weather, shipping delays, fire, flood, strikes, terrorism, inspections or other causes beyond the reasonable control of Review Development.

### SECTION THREE (Payment)

The Owner will compensate Review Development $138,520 as the Contract Price for the Work, subject to authorized increases and/or decreases as provided in Section Six below. Payments shall be made to Review Development based on on a payment schedule determined by Review Development and the Owner. If the Owner fails to make timely payment for services and materials provided, Review Development may elect to stop work until payment is made and the construction schedule shall be adjusted accordingly. Payment for allowances that are outside of the estimate (plumbing fixtures, tile, backsplash, appliances, cabinets and countertops) will be due before Review Development orders the materials.

### SECTION FOUR (Warranties)

Review Development warrants that the materials and equipment furnished under this Agreement will be of good quality, new (unless otherwise required or permitted by the architectural plans and specifications) and free from defects not inherent in the quality required or permitted. The Work will conform to the plans and specifications incorporated herein and will be of a good and workmanlike quality in accordance with local industry practices. Review Development warrants all work, equipment and materials for a period of two (2) years from the date of substantial completion walk-thru meeting. Non-payment of any portion of this Contract (or reimbursable costs) shall void warranty. This warranty excludes remedy for damage or defect caused by abuse, modifications not executed by Review Development, improper or insufficient maintenance, improper operation, or normal wear and tear under normal usage.

EXHIBIT 1

DocuSign Envelope ID: E40FE365-79FC-4694-8BE1-7CA96FC0D42A



Warranty work must be performed by Review Development and/or its subcontractors. The Owners will notify Review Development during the (2) year warranty period, if any warranty work is required. Review Development and/or its subcontractors will repair or replace all warranted items.

This warranty is in lieu of all other warranties, statutory or otherwise, express or implied, and all other representations made by Review Development and all other obligations or liabilities with respect to the Work, including implied warranties of merchantability and fitness are expressly excluded from this warranty.  Review Development warranty obligations shall not exceed those set forth in this section.  Review Development does not warranty Owner provided items.

SECTION FIVE (Insurance)

Review Development agrees to maintain in full force through the period of construction of this Project, insurance that will protect it from claims arising under workmen's compensation and other employee benefit laws.  Review Development further agrees that it will maintain in full force through the period of construction, insurance with limits of Two Million Dollars for injury, including death, and property damage, which may arise out of the Work performed by Review Development.

Owners agree to maintain property insurance during the construction of the Project on the building, renovation, materials and supplies at the site. Coverage to include, but not be limited to fire, extended coverage vandalism, malicious mischief, and theft.

SECTION SIX (Work Changes)

The parties may agree to changes in the Work without invalidating this Agreement by a Change Order. A Change Order shall be in writing and approved in writing by the Owner and Review Development. The Change Order shall identify the nature of the addition, deletion or modification, and shall show the adjustment to the Contract Price and any adjustment to the completion schedule. In the event that a work change involving a significant amount of research to create the change order is requested by the Owner, Review Development will charge Owner a processing fee of $150.00 per Change Order to cover that time associated with preparing the Change Order. If the changes are not executed, the fee will still be incurred. In the event that a requested change order requires an architect's time it will be charged to the Owner at $135 per hour. Payment for a Change Order is due and payable upon receipt.

SECTION SEVEN (Termination and Suspension)

This Agreement may be terminated by either party hereto upon seven (7) days written notice should the other party fail substantially to perform in accordance with the terms here of no fault of the other or if the Project in whole or substantial part is stopped for a period of sixty (60) days under an order of any court or other public authority having jurisdiction or as a result of an act of government.

In the event of termination, Review Development shall be paid for all Work performed and/or provided through the date of termination.

YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION.

SECTION EIGHT (Miscellaneous Provisions)

DocuSign Envelope ID: E40FE365-79FC-4694-8BE1-7CA96FC0D42A



This Agreement is based on the current city, county, state and federal laws and regulations. Additional costs incurred as a result of changes in governmental regulations shall be paid entirely by the Owners. Owners are responsible for the payment of all impact and governmental fees that may be associated with the Work. Owners shall not bring outside contractors onto the job site while this contract's work is being performed without written agreement from Review Development.

## SECTION NINE (Dispute Resolution)

Prior to litigation, the parties shall endeavor to settle disputes by non-binding mediation. If during the course of construction, a dispute arises, the parties will agree to either wait until the completion of the Project to submit the dispute to mediation together with all other disputes, or if there may be adverse ramifications to waiting until the completion of the Project, a party may request that the matter be submitted to mediation at that time.

The parties will mutually select an expert to serve as a mediator to assist in the resolution of the dispute. If the parties are unable to mutually agree on an expert, then the dispute shall be brought before American Arbitration Association under the Construction Industry Mediation Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise. All mediation costs shall be shared equally.

A demand for mediation shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for mediation be made after the date when institution or legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitation.

All claims, disputes or other matters in question arising out of this Agreement that are not resolved through mediation shall be determined by a state or federal court located in Washington, DC which has jurisdiction over this matter. ( Review Development is registered in Washington, DC). The parties specifically waive the right to a trial by jury in any court with respect to any and all claims, including but not limited to those sounding in Contract, tort or statute, against the other arising out of or connected in any way to the Project or this Agreement, because the parties hereto believe that the complex commercial and professional aspects of their dealings with one another make a jury determination neither desirable nor appropriate.

Severability. If any portion of this Agreement is held as a matter of law to be unenforceable, the remainder of this Agreement shall be enforceable without such provisions.

## SECTION TEN (Concealed Conditions)

This Agreement is based solely on the observations the Contractor was able to make with the structure in its current condition at the time this Agreement was prepared. If additional concealed conditions are discovered once work has commenced, which were *not* visible at the time this proposal was prepared, Contractor will stop work and point out the unforeseen concealed conditions to Owner so that the Owner and Contractor can execute a Change of Plans for any additional work.

DocuSign Envelope ID: E40FE365-79FC-4694-8BE1-7CA96FC0D42A



Owner:

_____    Evan Klondar        Date

DocuSigned by:

*Sarah Krieger*
7C88A125E22B415...    _____    Sarah Krieger        Date        11/7/2017

Review Development, LLC

_____

Jason D. Luttrell
Owner
Review Development, LLC

YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT
OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION.

ATTACHMENTS:

Scope of Work
Payment Schedule
Deposit Invoice 001

DocuSign Envelope ID: E40FE365-79FC-4694-8BE1-7CA96FC0D42A



(re)imagine (re)build (re)vitalize

## Project Scope: S Street Interior Remodel

| | |
|---|---|
| Date | Architect |
| November 05, 2017 | Jobi Jones |
| | 1901 Columbia Road, #201 |
| Client | Washington, DC 20009 |
| Klondar/Krieger | |
| 1419 S Street NW | Time Estimate: |
| Washington DC | 12-16 Weeks |

SCOPE OF WORK:
All work in Scope of Work completed per plans provided by Jobi Jones in conjunction with homeowner.

### TOTAL PROJECT COST: $138,520

Whole House

| | |
|---|---|
| Site Preparation:<br>Contractor will apply adequate dust and floor protection in the existing house throughout the construction process. | $1,850.00 |
| Tool Rental:<br>To include all associated costs for rental to trench in basement, as well as other associated tools needed for the project. | $600.00 |
| Dumpsters<br>Costs associated with roll-off dumpsters when required - price also includes appropriate permits for DC street parking. | $3,400.00 |
| Demolition<br>Includes all costs associated with demolition per plans.  Includes costs to temporarily shore walls as necessary. | $5,500.00 |
| 3rd Party Inspections<br>Price includes costs to pay for 3rd party inspections.  Any partial inspections to move the project faster or prevent delays to be paid by homeowner at $200.00 per inspection. | $1,000.00 |
| **Site Work Total** | **$12,350.00** |

Masonry and Rough Carpentry

| | |
|---|---|
| Concrete Trenching<br>Includes costs to trench hole in basement to move pipes per plans. Price includes removal of existing concrete and dirt, replacement of dirt, blue stone and compaction as necessary. | $1,500.00 |
| Concrete Work<br>New 4" slab in basement where trenching took place. | $700.00 |

DocuSign Envelope ID: E40FE365-79FC-4694-8BE1-7CA96FC0D42A

## review development
### (re)imagine(re)build(re)vitalize

| | |
|---|---:|
| New Masonry Opening<br>Price includes new steel lintel, temporary shoring and non-shrink grout as necessary. Opening to be three-feet finished - per plans. | $2,500.00 |
| Structural Framing<br>Install LVL's and posts per engineer's drawings. Includes costs for temporary shoring as needed. | $1,500.00 |
| Framing:<br>Includes all costs related to framing. Price includes all both pressure treated lumber and non pressure treated lumber per building code. | $9,050.00 |
| Landing and Stairs to Patio:<br>Install new landing and stairs to patio at rear of house. Price assumes pressure treated material for both decking and railing. Confirm dimensions with architect. | $2,750.00 |
| New Stairs to Basement<br>New custom stairs to basement. Assumes small landing - wood railing - balusters and white oak stair treads. Risers and balusters to be painted. | $3,100.00 |
| Expose Brick<br>Remove plaster from Brick on 2nd floor. Point brick, clean and seal. | $3,000.00 |
| **Masonry and Rough Carpentry Total** | **$24,100.00** |

Trade Work

| | |
|---|---:|
| Gas and Plumbing Subcontractor Proposal<br>Cost associated with running new plumbing and gas lines for kitchen, basement bathroom, powder room and master bathroom. Price assumes CPVC for supply lines and PVC for waste. All fittings to be ball bearing. Price includes associated permits. | $9,250.00 |
| **Plumbing and Gas Total** | **$9,250.00** |

Waterproofing, Doors, and Insulation

| | |
|---|---:|
| Exterior Door<br>Price for one new Exterior Door - thermatru door. Fiberglass doors per plan - painted - confirm style with architect. | $1,250.00 |
| Interior Doors<br>Price Includes all interior doors, per plans. Includes Hinges (homeowners to decide color). All doors to be primed - solid core doors. Homeowners to provide door hardware. | $2,000.00 |
| Waterproofing<br>Price includes schluter waterproofing in all bathrooms. Includes schluter ditra on all plywood substrates to prevent tile from cracking - including in kitchen. | $3,230.00 |

DocuSign Envelope ID: E40FE365-79FC-4694-8BE1-7CA96FC0D42A



| | |
|---|---|
| Insulation | $2,880.00 |

Price includes insulating wood framing in rear of house near new powder room per code - assumes open cell spray foam in walls and cold floor. Assumes fiberglass insulation in basement exterior walls.

Gypsum — $11,190.00

Includes all costs associated with installation of gypsum board. Price includes ½ Gypsum and mold resistant where necessary. Price also includes 3 coats of plaster, sanding and priming. Includes all new construction new walls, ceilings - includes basement - also includes patching plaster where necessary.

**Waterproofing, Doors, Insulation** — **$20,550.00**

### Trim, Tile and Paint

Tile — $7,630.00

Includes installation of tile per plans. All tile accessories including metal finishes to be provided by owner. Contractor to provide thinset and grout. Confirm installation and layout with architect.

Interior Trim — $4,950.00

Includes all costs associated with installing trim on the interior of the home. Confirm trim selection with homeowner.

Cabinet Install — $3,000.00

Includes installation of all cabinets and accessories. Includes cabinets in bathrooms and kitchen. Homeowner to provide hardware.

Appliance Install — $1,200.00

Includes installation of all appliances. Appliances to be provided by homeowner and will be installed per manufacturer specifications.

Paint — $6,030.00

Price assumes Benjamin Moore Regal Paint - Semi gloss for trim, flat ceiling white and flat for walls. Confirm Colors with Homeowner and Architect. Price assumes painting entire first floor, hallway to upstairs and master bathroom. Price does not include entire home.

Custom Mantel — $1,450.00

Includes all costs associated with custom mantel in living room. Specs to be provided by architect. Assumes paint-grade materials.

Closet Install — $1,000.00

Includes all associated costs with installation of closet system in Master Bathroom. Homeowner to provide materials and details of install

Front Patio Install — $4,200.00

Cost includes replacing decking on front exterior of home and repairing stairs as necessary. Assumes Trex decking or equivalent. Confirm selection with architect.

DocuSign Envelope ID: E40FE365-79FC-4694-8BE1-7CA96FC0D42A



Shower Glass
Price assumes shower glass per plans. Price assumes ⅜ tempered glass          $8,500.00
and custom fit. Confirm finishes with architect and homeowner.

**Tile, Trim, and Paint**                                                    **$37,960.00**

Hardwood

Hardwood Removal                                                             $2,100.00
Remove all existing hardwood from home. Includes removal of shoe
moulding.

Harwood Install, Sand and Seal                                              $6,500.00
Costs associated with hand-scraping floors where necessary, sanding
and sealing - clear coats. Price assumes installation of white oak
flooring. Hardwood to be paid for by homeowner. Confirm sizes with
architect.

Engineered Hardwood Install                                                 $1,850.00
Price includes all associated costs with installing hardwood flooring in
the basement. Price assumes gluing down engineered floor per specs.
Flooring provided by others.

**Hardwood**
                                                                          **$10,450.00**

Clean Up/ Dump Fees                                                        **$2,100.00**

Project Management                                                         **$6,000.00**

Overhead                                                                   **$5,620.00**

Profit                                                                    **$10,140.00**

DocuSign Envelope ID: E40FE365-79FC-4694-8BE1-7CA96FC0D42A



review development
(re)imagine(re)build(re)vitalize

6322 5th St. NW
Washington DC, 20011

Project Invoice - Deposit
Klondar/Krieger Renovation
11.05.2017

To:   Klondar/Kreiger
      1419 S Street NW
      Washington DC 20009

| Service | Cost | | % Due | % Paid | Due | |
|---|---|---|---|---|---|---|
| General Conditions (Floor Protection, Etc) | $ | 1,850.00 | 25% | 0% | $ | 462.50 |
| 3rd Party Inpections | $ | 1,000.00 | 25% | 0% | $ | 250.00 |
| Tool Rental (For Basement Trenching) | $ | 600.00 | 25% | 0% | $ | 150.00 |
| Dumpsters | $ | 3,400.00 | 25% | 0% | $ | 850.00 |
| Demolition | $ | 5,500.00 | 25% | 0% | $ | 1,375.00 |
| Concrete Trenching | $ | 1,500.00 | 25% | 0% | $ | 375.00 |
| Concrete Work (Basement) | $ | 700.00 | 25% | 0% | $ | 175.00 |
| Structural Work | $ | 1,500.00 | 25% | 0% | $ | 375.00 |
| New Masonry Opening | $ | 2,500.00 | 25% | 0% | $ | 625.00 |
| Framing | $ | 9,050.00 | 25% | 0% | $ | 2,262.50 |
| Plumbing | $ | 9,250.00 | 25% | 0% | $ | 2,312.50 |
| Electrical | $ | 0.00 | 25% | 0% | $ | 0.00 |
| Insulation | $ | 2,880.00 | 25% | 0% | $ | 720.00 |
| Drywall | $ | 11,190.00 | 25% | 0% | $ | 2,797.50 |
| Waterproofing | $ | 3,230.00 | 25% | 0% | $ | 807.50 |
| Tile Labor | $ | 7,630.00 | 25% | 0% | $ | 1,907.50 |
| New Stairs to Basement | $ | 3,100.00 | 25% | 0% | $ | 775.00 |
| Cabinet Install | $ | 3,000.00 | 25% | 0% | $ | 750.00 |
| Appliance Install | $ | 1,200.00 | 25% | 0% | $ | 300.00 |
| New Fiberglass Exterior Door | $ | 1,250.00 | 25% | 0% | $ | 312.50 |
| Interior Doors | $ | 2,000.00 | 25% | 0% | $ | 500.00 |
| Trim Carpentry | $ | 4,950.00 | 25% | 0% | $ | 1,237.50 |
| Paint | $ | 6,030.00 | 25% | 0% | $ | 1,507.50 |
| Custom Mantel | $ | 1,450.00 | 25% | 0% | $ | 362.50 |
| Stairs to Patio | $ | 2,750.00 | 25% | 0% | $ | 687.50 |
| Remove Plaster - Point Brick and Seal - Upstairs | $ | 3,000.00 | 25% | 0% | $ | 750.00 |
| Closet Install (Labor Only) | $ | 1,000.00 | 25% | 0% | $ | 250.00 |
| Remove Existing Flooring | $ | 2,100.00 | 25% | 0% | $ | 525.00 |
| Install New Hardwood - Install, Sanded, Stained | $ | 6,500.00 | 25% | 0% | $ | 1,625.00 |
| Engineered Hardwood Install | $ | 1,850.00 | 25% | 0% | $ | 462.50 |
| Replace Front Patio (Assumes Trex Decking) | $ | 4,200.00 | 25% | 0% | $ | 1,050.00 |
| Shower Glass | $ | 8,500.00 | 25% | 0% | $ | 2,125.00 |
| Clean Up/Dump Fees | $ | 2,100.00 | 25% | 0% | $ | 525.00 |
| Project Management | $ | 6,000.00 | 25% | 0% | $ | 1,500.00 |
| Overhead | $ | 5,620.00 | 25% | 0% | $ | 1,405.00 |
| Profit | $ | 10,140.00 | 25% | 0% | $ | 2,535.00 |

| | | |
|---|---|---|
| Project Cost | $ | 138,520.00 |
| Amount Due | $ | 34,630.00 |
| Amount Paid | $ | 0.00 |
| Remaining | $ | 103,890.00 |



6322 5ᵗʰ St. NW
Washington, DC 20011
770.362.0282

## S Street Payment Schedule

| Draw | | Amount | % of Payment |
|---|---|---|---|
| 1. | Deposit at Signing of Contract | $ 34,630.00 | 25% |
| 2. | Start of Rough Framing | $ 20,778.00 | 15% |
| 3. | Start of Plumbing and/or Electrical | $ 20,778.00 | 15% |
| 4. | Start of Drywall | $ 13,852.00 | 10% |
| 5. | Start of Tile and/or Install | $ 13,852.00 | 10% |
| 6. | Start of Interior Painting | $ 13,552.00 | 10% |
| 7. | Substantially Complete<br>Prepare Punch list with Owner<br>(Two Year warranty Begins at walkthru meeting) | $ 13,852.00 | 10% |
| 8. | Final Payout | $ 6,926.00 | 5% |
| | **Total Contract Price** | **$138,520.00** | **100%** |



review development

(re)imagine(re)build(re)vitalize

6322 5th St. NW
Washington DC, 20011

Project Invoice - Sub. Complete                    To:   Klondar/Kreiger
Klondar/Krieger Renovation                               1419 S Street NW
12.02.18                                                 Washington DC 20009

| Service | Cost | % Due | % Paid | Due |
|---|---|---|---|---|
| General Conditions (Floor Protection, Etc) | $ 1,850.00 | 3% | 95% | $ 55.50 |
| 3rd Party Inpections | $ 1,000.00 | 3% | 95% | $ 30.00 |
| Tool Rental (For Basement Trenching) | $ 600.00 | 3% | 95% | $ 18.00 |
| Dumpsters | $ 3,400.00 | 3% | 95% | $ 102.00 |
| Demolition | $ 5,500.00 | 3% | 95% | $ 165.00 |
| Concrete Trenching | $ 1,500.00 | 3% | 95% | $ 45.00 |
| Concrete Work (Basement) | $ 700.00 | 3% | 95% | $ 21.00 |
| Structural Work | $ 1,500.00 | 3% | 95% | $ 45.00 |
| New Masonry Opening | $ 2,500.00 | 3% | 95% | $ 75.00 |
| Framing | $ 9,050.00 | 3% | 95% | $ 271.50 |
| Plumbing | $ 9,250.00 | 3% | 95% | $ 277.50 |
| Electrical | $ 8,480.00 | 3% | 95% | $ 254.40 |
| Insulation | $ 2,880.00 | 3% | 95% | $ 86.40 |
| Drywall | $ 11,190.00 | 3% | 95% | $ 335.70 |
| Waterproofing | $ 3,230.00 | 3% | 95% | $ 96.90 |
| Tile Labor | $ 7,630.00 | 3% | 95% | $ 228.90 |
| New Stairs to Basement | $ 3,100.00 | 3% | 95% | $ 93.00 |
| Cabinet Install | $ 3,000.00 | 3% | 95% | $ 90.00 |
| Appliance Install | $ 1,200.00 | 3% | 95% | $ 36.00 |
| New Fiberglass Exterior Door | $ 1,250.00 | 3% | 95% | $ 37.50 |
| Interior Doors | $ 2,000.00 | 3% | 95% | $ 60.00 |
| Trim Carpentry | $ 4,950.00 | 3% | 95% | $ 148.50 |
| Paint | $ 6,030.00 | 3% | 95% | $ 180.90 |
| Custom Mantel | $ 1,450.00 | 3% | 95% | $ 43.50 |
| Stairs to Patio | $ 2,750.00 | 3% | 95% | $ 82.50 |
| Remove Plaster - Point Brick and Seal - Upstairs | $ 3,000.00 | 3% | 95% | $ 90.00 |
| Closet Install (Labor Only) | $ 1,000.00 | 3% | 95% | $ 30.00 |
| Remove Existing Flooring | $ 2,100.00 | 3% | 95% | $ 63.00 |
| Install New Hardwood - Install, Sanded, Stained | $ 6,500.00 | 3% | 95% | $ 195.00 |
| Engineered Hardwood Install | $ 1,850.00 | 3% | 95% | $ 55.50 |
| Replace Front Paint | $ 4,200.00 | 3% | 95% | $ 126.00 |
| Shower Glass | $ 8,500.00 | 3% | 95% | $ 255.00 |
| Clean Up/Dump Fees | $ 2,100.00 | 3% | 95% | $ 63.00 |
| Project Management | $ 6,000.00 | 3% | 95% | $ 180.00 |
| Overhead | $ 5,620.00 | 3% | 95% | $ 168.60 |
| Profit | $ 10,140.00 | 3% | 95% | $ 304.20 |
| Change Order - HVAC - Roofing - Etc | $ 57,485.00 | 0% | 100% | $ 0.00 |
| Change Order - Rebuild Exterior of Annex | $ 2,140.00 | 0% | 100% | $ 0.00 |
| Change Order - Heated Masterbathroom Floor | $ 1,220.00 | 0% | 100% | $ 0.00 |
| 3 -1/4" White Oak Flooring Materials | $ 4,184.00 | 0% | 100% | $ 0.00 |
| Countertops Labor & Materials | $ 6,130.00 | 0% | 100% | $ 0.00 |
| Hot Water Heater (installed) | $ 1,930.00 | 0% | 100% | $ 0.00 |

EXHIBIT 2

| | | | | | |
|---|---|---|---|---|---|
| Paint Front of House | $ | 1,940.00 | 0% | 100% | $ | 0.00 |
| Additional Interior Paint (not included in scope) | $ | 734.00 | 0% | 100% | $ | 0.00 |
| Disposal (purchase from ferguson) | $ | 297.00 | 0% | 100% | $ | 0.00 |
| Under cabinet Light Materials | $ | 364.00 | 0% | 100% | $ | 0.00 |
| Basement Access Panels | $ | 280.00 | 0% | 100% | $ | 0.00 |
| Basement Flooring Materials | $ | 2,553.00 | 0% | 100% | $ | 0.00 |
| Walnut Floating Shelves x3 | $ | 750.00 | 0% | 100% | $ | 0.00 |
| 10 Foot Floating Shelf | $ | 400.00 | 0% | 100% | $ | 0.00 |
| Granite for Hearth | $ | 512.80 | 0% | 100% | $ | 0.00 |
| Storm Doors x 2 | $ | 906.00 | 0% | 100% | $ | 0.00 |
| Gas Line for Dryer | $ | 300.00 | 0% | 100% | $ | 0.00 |
| Recessed White Oak Floor Vent | $ | 180.00 | 0% | 100% | $ | 0.00 |
| Recessed Cubbies in Dining Room | $ | 2,330.00 | 0% | 100% | $ | 0.00 |
| New Drain at door in basement | $ | 380.00 | 0% | 100% | $ | 0.00 |
| Locks Keyed the Same | $ | 45.00 | 0% | 100% | $ | 0.00 |
| Guest Bathroom Toilet | $ | 265.80 | 100% | 0% | $ | 265.80 |
| Cat Cubby | $ | 1,000.00 | 100% | 0% | $ | 1,000.00 |
| Re-Paint Exterior | $ | 1,300.00 | 100% | 0% | $ | 1,300.00 |
| Paint Grade Floating Shelves - Basement x4 | $ | 800.00 | 100% | 0% | $ | 800.00 |
| Walnut Floating Shelves - Basement x4 | $ | 1,000.00 | 100% | 0% | $ | 1,000.00 |
| Basement Countertop and Sink | $ | 612.00 | 100% | 0% | $ | 612.00 |

| | | |
|---|---|---|
| Project Cost | $ | 237,038.60 |
| **Amount Due** | **$** | **9,387.80** |
| Deposit - 11.05.17 | $ | 34,630.00 |
| Invoice Rough Framing - 12.01.17 | $ | 20,778.00 |
| Invoice Start of Trades - 12.19.17 | $ | 25,442.00 |
| Change Order 001 - 1.19.18 | $ | 43,113.75 |
| Invoice Start of Drywall - 2.15.18 | $ | 29,557.00 |
| Invoice Start of Tile - 3.03.18 | $ | 27,888.25 |
| Invoice Start of Paint - 3.22.18 | $ | 14,700.00 |
| Invoice Substantial Complete 1 | $ | 12,615.00 |
| Invoice Substantial Complete 2 | $ | 15,986.80 |
| Remaining | $ | 2,940.00 |

# Renovation Project Status Report

## Prepared for Sarah Krieger & Evan Klondar
### 1419 S ST NW, Washington DC  20009
### October 22, 2020 – Version: 1.0

This analysis is being prepared by DC Building Plans & Consultants at the request of the homeowners – Sarah Krieger and Evan Klondar - of the subject property.

## Existing Condition Notes

Existing home is a Two-Story brick home plus Basement
- There is walkout from Basement, which is mostly below grade
- The home sits on a mostly rectangular lot with very little slope
- The home is south facing
- The home is a mid-row, row home with a dogleg, two party walls, and rear alley access
- The basement-level walkout to the rear does not meet building code, but was not to code when purchased by the current homeowners

## Renovation Project Background and Contracting Participants

The renovation project at the home dates from a renovation permitted by DC DCRA on 10/27/17, under B1800970.

The Client and the Contractor executed a renovation and construction contract on 11/07/17.

The Client and the Contractor executed or mutually agreed to additional Change Orders on or about 01/09/18, and subsequently agreed to a mini-split program for the HVAC which includes 2 outdoor units.

The Permit Set of Plans are issued on 10/16/17 and are authored by DC ARC, #102876, Jobi Lynne Jones.
1. The permit set of plans and the original scope of work are generally in compliance with one another.
2. Several items from the list of Change Orders should have gained additional or amended building permits.

The Structural Engineer of record is Alireza Shahbaz, PE, with DC PE #9015. The structural work is minimally defined in the permit set.

EXHIBIT 3

# Renovation Project Status Report

Prepared for Sarah Krieger & Evan Klondar

1419 S ST NW, Washington DC  20009

October 22, 2020 – Version: 1.0

## Contract/Contractor Issues

The General Contractor of record is review development and based on a current review of electronic public records was unlicensed at the time of the contract.

**review development, Jason Lutrell, DC HIC # 4203-15000426 expired on 08/31/2017**

**review development, Jason Lutrell, DC GC/CM # 4105-15000602 commenced on 09/01/19 for a new, 2-year period**

**the date of the renovation contract was 11/07/17**

*as of 10/22/20 we have not been able to access any other records or verifications other than the electronic files to re-verify the above licensing information*

Additionally:

- The Contractor license number with DC DCRA (either HIC or GC/CM) is not included on the Contractor's contract presented to the Clients, nor does a copy of any license appear as an addendum to said Contract.
- The Contractor did not provide the Client with a copy of their Certificate of Insurance (or an issued certificate naming the Client as a named insured) for his General Liability and Workman's Comp Insurances, as well as any company-owned vehicles (if any)
- The Contractor did not provide the Client with EPA Lead Certification at the time of Contract (all homes built before 1978)
  - o Nor did the Contractor with the relevant acknowledgement of the EPA Renovate Right brochure and signature of understanding and receipt
- The Contractor does not have a DC DOEE Lead Badge Certification, which is required when disturbing more than 500 SF of wallboard in a home built before 1978

## Permits and Inspections for the Renovations

*(based on a review of DC inspections and open permit records)*

B1800970: Construction/Alteration and Repair (date of issuance: 10/27/17)
      Issued to Sarah E. Krieger Revocable Trust
      Agent: Jobi Jones
      Building Close-in: 02/15/18

# Renovation Project Status Report

## Prepared for Sarah Krieger & Evan Klondar
### 1419 S ST NW, Washington DC  20009
### October 22, 2020 – Version: 1.0

Building Final Inspection: NONE

P1801569: Supplemental Plumbing & Gas (date of issuance: 11/28/17)
    Issued to Jerone Scott
    Plumbing Close-in: No record
    Pluming Final: NONE

E1802500: Supplemental Electrical (date of issuance: 12/19/17)
    Issued to Anthony Harris
    Electrical Close-in: 02/15/18
    Electrical Final: NONE

M1801420: Supplemental Mechanical (date of issuance: 02/13/18)
    Issued to Stephen Holman
    Mechanical Close-in: 02/15/18
    Mechanical Final: NONE

P1803740: Supplemental Plumbing & Gas (date of issuance: 02/16/18)
    Issued to Franklin Gaines
    Plumbing Close-in: No record
    Plumbing Final: NONE

All inspections to date took place via a single site visit by CamJap Inspections inspector Larry Wemyss on or about 02/14/18.

Trade permits are likely shadow permits – i.e., work was not actually performed by the trade contractor who pulled the permits, especially Scott and Gaines.

Final Inspections can be done in multi-disciplinary format.

### Steps to be Taken to close out project:

1. Original Building Permit should be administratively reopened / extended so that final inspections can be obtained
   a. Some Trade Permits may need to be re-issued to some representative trades
2. New, Licensed & Insured GC to then call in for Final Inspections and obtain final working list, or punch list, in efforts to complete the inspections on the open permits
3. Recommend using 3rd Party inspector MCP if they are available
4. Complete punch list and obtain final inspections approval for all open permits, including trades

# Renovation Project Status Report

Prepared for Sarah Krieger & Evan Klondar
1419 S ST NW, Washington DC  20009
October 22, 2020 – Version: 1.0

**Estimated Costs to Finalize and Close-out Permits**: $5,500 - $6,500

## Primary Construction and Remodeling Issues to be Addressed from the Scope of Work and Change Orders

1. The Hardi-panel siding (skin) at the rear addition should be completely removed and replaced all the way back to the primary sheathing for the addition area.
   - This includes all trim and flexible/metal flashing and counter flashing around windows and doors.
   - Install new building paper, trim, siding (skin), and paint.
2. Perform complete roof and flashing check. If possible, verify that the new roof was in fact a complete tear off and not just an overlay.
3. Temporarily remove rear dogleg gutters and then install necessary exterior soffits, facias, and rakes at the rear dogleg. Paint all trim boards. Reinstall gutters and downspouts. *This should have been done as part of purchasing a "new" roof.*
   - Minor brick point work should be undertaken as well.
   - There are open holes between the roof and the walls into the attic space
4. The rear wood and composite tread stairs into the back yard from the addition need to be removed and rebuilt to code as they are not properly structured or flashed at the intersection with the house.
5. The new side exterior door should be reinstalled with a concrete curb below. Also, very poor workmanship.
6. The rear exterior door in the addition will need to be reinstalled as well. Very poor workmanship and likely needs a new rough opening to prevent further settlement/lack of a square opening.
7. Verify satisfactory roof insulation at upper floor (applicable DC building code/IRC is currently R-49 and Contractor Change Orders (01-09-18) indicates only R-38)
   - *The roof assembly itself can add R-value if done with intent*
8. The bottom of the crawl space floor assembly needs vapor and sheathing
9. The new/re-routed waste stack running under crawl space needs to be encapsulated and insulated

## Other:

1. There is a visible foundation wall crack (pre-existing wall) on the northeast corner of the existing addition that must be addressed and the new renovation work in the addition should not have occurred without addressing this first.
   a. It is possible that the addition work could have exacerbated the problem as well

# Renovation Project Status Report

Prepared for Sarah Krieger & Evan Klondar

1419 S ST NW, Washington DC  20009

October 22, 2020 – Version: 1.0

*This work list is generated only in general terms and it should not be the entire list of issues or problems at the home.*

**Estimated Costs to Remedy Defective/Incomplete Work**: $40,000 - $50,000

**Change Order Work Technically Requiring Permits to have been amended:**

1. Structural Work, cross strapping and shore up ridge line/girder. Work defined as "per engineer" but there is no letter from PE for guiding how work to be performed.
2. Remove Drywall and Insulate at roof/ceiling
3. Replace Exterior Doors at rear would require approval from Greater U ST Historic Desk even though they are on the rear of the property



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Sarah E. Krieger Trustee, et al.
_____
                                        Plaintiff
                vs.

                                                    Case Number    **2020 CA 004714 B**

Review Development, LLC
_____
                                        Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Christopher A. Glaser   (Bar #463583)
_____
Name of Plaintiff's Attorney                              *Clerk of the Court*

2300 N Street, NW, Suite 300                     By _____
Address                                                                    Deputy Clerk
Washington, DC 20037

(202) 457-1612                                          Date    **11/17/2020**
_____
Telephone
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bản dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시오    የአማርኛ ትርጉም ለማግኘት (202) 879-4828   ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                                    Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
Sección de Acciones Civiles
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
                           Demandante
            contra

                                        Número de Caso: _____

_____
                           Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                        *SECRETARIO DEL TRIBUNAL*
_____
Nombre del abogado del Demandante

                              Por: _____
_____
Dirección                                    Subsecretario

_____

                              Fecha _____
_____
Teléfono
如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면 (202) 879-4828 로 전화해주십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                        Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Sarah E. Krieger Trustee, et al.
_____
                                    Plaintiff
                    vs.
                                                    Case Number    **2020 CA 004714 B**

Jason Luttrell
_____
                                    Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Christopher A. Glaser  (Bar #463583)
_____
Name of Plaintiff's Attorney                              Clerk of the Court

2300 N Street, NW, Suite 300                    By _____
Address                                                              Deputy Clerk
Washington, DC 20037

(202) 457-1612                                         Date    **11/17/2020**
Telephone
如需翻译,请打电话 (202) 879-4828       Veuillez appeler au (202) 879-4828 pour une traduction       Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시요       የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                    Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
Sección de Acciones Civiles
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
                    Demandante

              contra

                                                    Número de Caso: _____

_____
                    Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____
Nombre del abogado del Demandante

_____
Dirección

_____

_____
Teléfono

*SECRETARIO DEL TRIBUNAL*

Por: _____
                    Subsecretario

Fecha _____

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

만약[번역을 원하시면](202) 879-4828 로 전화주십시요.    የአማርኛ ትርጉም ለማግኘት (202) 879-4828  ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                                Super. Ct. Civ. R. 4

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

SARAH KRIEGER TRUSTEE, ET AL.

Case Number: **2020 CA 004714 B**

vs

Date: _____ November 17, 2020

REVIEW DEVELOPMENT  LLC  ET AL.

☐ One of the defendants is being sued in their official capacity.

| Name: *(Please Print)*<br>Christopher A. Glaser | Relationship to Lawsuit |
|---|---|
| Firm Name:<br>Jackson & Campbell, PC | ☒ Attorney for Plaintiff |
| Telephone No.:   Six digit Unified Bar No.:<br>202-457-1612   463583 | ☐ Self (Pro Se)<br>☐ Other: _____ |

TYPE OF CASE:  ☒ Non-Jury   ☐ 6 Person Jury   ☐ 12 Person Jury

Demand: $  224,710.80   Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____   Judge: _____   Calendar #:_____

Case No.:_____   Judge: _____   Calendar#:_____

---

NATURE OF SUIT:   *(Check One Box Only)*

**A. CONTRACTS**                                   **COLLECTION CASES**

☒ 01 Breach of Contract
☐ 02 Breach of Warranty
☐ 06 Negotiable Instrument
☐ 07 Personal Property
☐ 13 Employment Discrimination
☐ 15 Special Education Fees

☐ 14 Under $25,000 Pltf. Grants Consent
☐ 17 OVER $25,000 Pltf. Grants Consent
☐ 27 Insurance/Subrogation
  Over $25,000 Pltf. Grants Consent
☐ 07 Insurance/Subrogation
  Under $25,000 Pltf. Grants Consent
☐ 28 Motion to Confirm Arbitration
  Award (Collection Cases Only)

☐ 16 Under $25,000 Consent Denied
☐ 18 OVER $25,000 Consent Denied
☐ 26 Insurance/Subrogation
  Over $25,000 Consent Denied
☐ 34 Insurance/Subrogation
  Under $25,000 Consent Denied

**B. PROPERTY TORTS**

☐ 01 Automobile
☐ 02 Conversion
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

☐ 03 Destruction of Private Property
☐ 04 Property Damage

☐ 05 Trespass

**C. PERSONAL TORTS**

☐ 01 Abuse of Process
☐ 02 Alienation of Affection
☐ 03 Assault and Battery
☐ 04 Automobile- Personal Injury
☐ 05 Deceit (Misrepresentation)
☐ 06 False Accusation
☐ 07 False Arrest
☐ 08 Fraud

☐ 10 Invasion of Privacy
☐ 11 Libel and Slander
☐ 12 Malicious Interference
☐ 13 Malicious Prosecution
☐ 14 Malpractice Legal
☐ 15 Malpractice Medical (Including Wrongful Death)
☐ 16 Negligence- (Not Automobile,
  Not Malpractice)

☐ 17 Personal Injury- (Not Automobile,
  Not Malpractice)
☐ 18 Wrongful Death (Not Malpractice)
☐ 19 Wrongful Eviction
☐ 20 Friendly Suit
☐ 21 Asbestos
☐ 22 Toxic/Mass Torts
☐ 23 Tobacco
☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE          IF USED

CV-496/June 2015

# Information Sheet, Continued

---

**C. OTHERS**

- [ ] 01 Accounting
- [ ] 02 Att. Before Judgment
- [ ] 05 Ejectment
- [ ] 09 Special Writ/Warrants
  (DC Code § 11-941)
- [ ] 10  Traffic Adjudication
- [ ] 11 Writ of Replevin
- [ ] 12 Enforce Mechanics Lien
- [ ] 16 Declaratory Judgment

- [ ] 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- [ ] 18 Product Liability

- [ ] 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- [ ] 29 Merit Personnel Act (OHR)
- [ ] 31 Housing Code Regulations
- [ ] 32 Qui Tam
- [ ] 33 Whistleblower

---

**II.**

- [ ] 03 Change of Name
- [ ] 06 Foreign Judgment/Domestic
- [ ] 08 Foreign Judgment/International
- [ ] 13 Correction of Birth Certificate
- [ ] 14 Correction of Marriage
  Certificate
- [ ] 26 Petition for Civil Asset Forfeiture (Vehicle)
- [ ] 27 Petition for Civil Asset Forfeiture (Currency)
- [ ] 28 Petition for Civil Asset Forfeiture (Other)

- [ ] 15 Libel of Information
- [ ] 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- [ ] 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- [ ] 21 Petition for Subpoena
  [Rule 28-I (b)]
- [ ] 22 Release Mechanics Lien
- [ ] 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- [ ] 24 Petition for Structured Settlement
- [ ] 25 Petition for Liquidation

---

**D.  REAL PROPERTY**

- [ ] 09 Real Property-Real Estate
- [ ] 12 Specific Performance
- [ ] 04 Condemnation (Eminent Domain)
- [ ] 10 Mortgage Foreclosure/Judicial Sale
- [ ] 11 Petition for Civil Asset Forfeiture (RP)

- [ ] 08 Quiet Title
- [ ] 25 Liens: Tax / Water Consent Granted
- [ ] 30 Liens: Tax / Water Consent Denied
- [ ] 31 Tax Lien Bid Off Certificate Consent Granted

---

_____
Attorney's Signature

_____11/17/20_____
Date

CV-496/ June 2015



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
Telephone: (202) 879-1133 • Website: www.dccourts.gov

SARAH E. KRIEGER TRUST et al
  Vs.                                                   C.A. No.      2020 CA 004714 B
REVIEW DEVELOPMENT, LLC et al

### INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) This case is assigned to the judge and calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of (a) the summons, (b) the complaint, and (c) this Initial Order and Addendum. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4(m).

(3) Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

(4) At the time stated below, all counsel and unrepresented parties shall participate in a remote hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients **before** the hearing whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this hearing.**

(5) If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Anita M. Josey-Herring

Case Assigned to: Judge JOSE M LOPEZ
Date:        November 17, 2020
Initial Conference: **REMOTE HEARING - DO NOT COME TO COURTHOUSE**
**SEE REMOTE HEARING INSTRUCTIONS ATTACHED TO INITIAL ORDER**

9:30 am, Friday, February 19, 2021
Location:  Courtroom 212
           500 Indiana Avenue N.W.
           WASHINGTON, DC  20001

1

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

D.C. Code § 16-2821, which part of the Medical Malpractice Proceedings Act of 2006, provides,    "[a]fter action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ('ISSC'"), prior to any further litigation in an effort to reach a settlement agreement.  The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC."

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available.  Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov.  Unrepresented plaintiffs who elect not to eFile must either mail the form to the Multi-Door Dispute Resolution Office at, Suite 2900, 410 E Street, N.W., Washington, DC 20001, or deliver if in person if the Office is open for in-person visits.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles.  All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one.  D.C. Code § 16-2823(b).

The following people are required by D.C. Code § 16-2824 to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826.  Any Plaintiff who is unrepresented may mail the form to the Civil Actions Branch at [address] or deliver it in person if the Branch is open for in-person visits. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Anita M. Josey-Herring

### Civil Remote Hearing Instructions for Participants

The following instructions are for participants who are scheduled to have cases heard before a Civil Judge in a **Remote Courtroom**

**Option1:** **(AUDIO ONLY/Dial-in by Phone):**

Toll 1 (844) 992-4762 or (202) 860-2110, enter the Meeting ID from the attachment followed by #, press again to enter session.

* *Please call in no sooner than 5 minutes before your scheduled hearing time. Once you have joined the session, please place your phone on mute until directed otherwise. If you should happen to get disconnected from the call, please call back in using the phone number and access number provided and the courtroom clerk will mute your call until the appropriate time.*

If you select **Option 2** or **Option 3** use the Audio Alternative

**Option 2: (LAPTOP/ DESKTOP USERS 1):**

Open Web Browser in Google Chrome and copy and paste following address from the next page:
https://dccourts.webex.com/meet/XXXXXXXXX

**Option 3: (LAPTOP/ DESKTOP USERS 2):**

Open Web Browser in Google Chrome and copy and paste following address
https://dccourts.webex.com   Select **Join**, enter the Meeting ID from the next page

AUDIO ALTERNATIVE:  Instead of automatically using **USE COMPUTER FOR AUDIO**, select **CALL-IN** and follow the **CALL-IN** prompt window.  Use a cell phone or desk phone. You will be heard clearer if you **do not** place your phone on SPEAKER. It is very important that you enter the **ACCESS ID #** so that your audio is matched with your video.



**Option 4: (Ipad/SMART PHONE/TABLET):**

* Go to App Store, Download WebEx App (Cisco WebEx Meetings)
* Sign into the App with your Name and Email Address
* Select Join Meeting
* Enter address from the next page: https://dccourts.webex.com/meet/XXXXXXXXX
* Click join and make sure your microphone is muted and your video is unmuted (if you need to be
* seen). If you only need to speak and do not need to be seen, use the audio only option.
* When you are ready click "Join Meeting". If the host has not yet started the meeting, you will be placed in the lobby until the meeting begins.

**For Technical Questions or issues Call: (202) 879-1928, Option #2**

Superior Court of the District of Columbia
Public Access for Remote Court Hearings
(Effective August 24, 2020)

**The current telephone numbers for all remote hearings are: 202-860-2110 (local) or 844-992-4726
(toll free).** After dialing the number, enter the WebEx Meeting ID as shown below for the courtroom.
Please click a WebEx Direct URL link below to join the hearing online.

Audio and video recording; taking pictures of remote hearings; and sharing the live or recorded
remote hearing by rebroadcasting, live-streaming or otherwise are not allowed

| Division | Courtroom | Types of Hearings Scheduled in Courtroom | Public Access via WebEx | |
|---|---|---|---|---|
| | | | **WebEx Direct URL** | **WebEx Meeting ID** |
| Auditor Master | 206 | Auditor Master Hearings | https://dccourts.webex.com/meet/ctbaudmaster | 129 648 5606 |
| Civil | 100 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb100 | 129 846 4145 |
| | 205 | Foreclosure Matters | https://dccourts.webex.com/meet/ctb205 | 129 814 7399 |
| | 212 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb212 | 129 440 9070 |
| | 214 | Title 47 Tax Liens; and Foreclosure Hearings | https://dccourts.webex.com/meet/ctb214 | 129 942 2620 |
| | 219 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb219 | 129 315 2924 |
| | 221 | Civil 1 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb221 | 129 493 5162 |
| | 318 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb318 | 129 801 7169 |
| | 320 | | https://dccourts.webex.com/meet/ctb320 | 129 226 9879 |

| 400 | Judge in Chambers Matters including Temporary Restraining Orders, Preliminary Injunctions and Name Changes | https://dccourts.webex.com/meet/ctb400 | 129 339 7379 |
|---|---|---|---|
| 415 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb415 | 129 314 3475 |
| 516 | | https://dccourts.webex.com/meet/ctb516 | 129 776 4396 |
| 517 | | https://dccourts.webex.com/meet/ctb517 | 129 911 6415 |
| 518 | | https://dccourts.webex.com/meet/ctb518 | 129 685 3445 |
| 519 | | https://dccourts.webex.com/meet/ctb519 | 129 705 0412 |
| JM-4 | | https://dccourts.webex.com/meet/ctbjm4 | 129 797 7557 |
| A-47 | Housing Conditions Matters | https://dccourts.webex.com/meet/ctba47 | 129 906 2065 |
| B-52 | Debt Collection and Landlord and Tenant Trials | https://dccourts.webex.com/meet/ctbb52 | 129 793 4102 |
| B-53 | Landlord and Tenant Matters including Lease Violation Hearings and Post Judgment Motions | https://dccourts.webex.com/meet/ctbb53 | 129 913 3728 |
| B-109 | Landlord and Tenant Matters | https://dccourts.webex.com/meet/ctbb109 | 129 127 9276 |
| B-119 | Small Claims Hearings and Trials | https://dccourts.webex.com/meet/ctbb119 | 129 230 4882 |

# EXHIBIT "B"

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION


- - - - - - - - - - - - - - - x
SARAH E. KRIEGER TRUST, ET AL., :   Docket No.: 2020-CAB-004714
                                :
     Plaintiffs,                :
                                :
     vs.                        :
                                :
REVIEW DEVELOPMENT, LLC, ET AL., :
                                :
     Defendants.               :
                                :   Monday, January 31, 2022
- - - - - - - - - - - - - - - x   Washington, D.C.


        The above-entitled action came on for a hearing

before the HONORABLE YVONNE M. WILLIAMS, Associate Judge, in

Courtroom Number 212.


                APPEARANCES:


                On Behalf of the Plaintiffs:

                ZACHARY L. CHAPMAN, ESQUIRE
                Washington, D.C.



                On Behalf of the Defendants:

                NO APPEARANCE




                                                23-04005


www.escribers.net | 800-257-0885

1                          C O N T E N T S

2                             WITNESSES

3                      DIRECT   CROSS   REDIRECT   RECROSS

4

5   On behalf of the Plaintiffs:

6   Evan Sydney Klondar

7       by Mr. Chapman              4

8   Sarah Elizabeth Judith Krieger

9       by Mr. Chapman              15

10

11

12                      E X H I B I T S

13  NUMBER                  DESCRIPTION            ID'D   REC'D

14  On behalf of the Plaintiffs

15  1 - Contract                                          11

16  2 - Breakdown of cost estimates and payments made     12

17  3 - Report of defective work                          24

18

19                  M I S C E L L A N E O U S

20  COURT'S RULING                                        26

21

22

23

24

25

1      P R O C E E D I N G S

2          THE DEPUTY CLERK:  Now I'm calling case number

3   2020 CA 4714 in the matter of Sarah Krieger Trust, et al.

4   versus Review Development, LLC, et al.

5          Parties, please state your names for the record.

6          MR. CHAPMAN:  Good morning, Your Honor.  This is

7   Zach Chapman.  I'm counsel for the plaintiffs in this

8   matter, Sarah Krieger, Trustee of the Sarah E. Krieger

9   Trust; Evan Klondar; and Sarah Krieger.

10         THE COURT:  Good morning.  All right.  So we're

11   here today for an ex parte proof hearing.  I did receive

12   your exhibits that seem to be the agreement that you had

13   with -- that the party had with Review Development for

14   renovations that were not completed.  So are you ready to

15   conduct your inquiry?

16         MR. CHAPMAN:  Yes, Your Honor.

17         THE COURT:  Are you going to speak with both or

18   one at a time?

19         MR. CHAPMAN:  Yes, Your Honor.  I can swear -- we

20   can swear both of them in at once.  They are going to

21   testify to separate topics, but I think it will be pretty

22   linear.  There won't be a long back and forth.  Once one of

23   them has completed their testimony, we'll move to the other,

24   and it will be limited to that.

25         THE COURT:  All right.  Well, we'll start with Ms.



1   Krieger.  Ms. Davenport, let's swear in Ms. Krieger.  If you

2   can raise your right hand, please.

3        (Witness sworn)

4        THE DEPUTY CLERK:  Thank you.

5        MR. CHAPMAN:  Your Honor, it might make more

6   sense, based on the topics, if we start with Mr. Klondar,

7   actually, if that would be okay.

8        THE COURT:  Oh, that's fine.  Let's swear in Mr.

9   Klondar.  If you can raise your right hand.

10       Thereupon,

11                    **EVAN SYDNEY KLONDAR**

12   having been called as a witness for and on behalf of the

13   Plaintiffs, and having been first duly sworn by the Deputy

14   Clerk, was examined and testified as follows:

15       THE COURT:  All right.  You may begin.

16       MR. CHAPMAN:  All right.  Thank you.

17                    **DIRECT EXAMINATION**

18       BY MR. CHAPMAN:

19   Q    Mr. Klondar, can you just state your name for the

20   record?

21   A    Yes.  Evan Sydney Klondar.

22   Q    And where do you live?

23   A    1419 S Street NW, in Washington, DC.

24   Q    Okay.  And can you just tell us, kind of give us a

25   background on how you learned about Review Development and

1    the other defendant, Jason Luttrell?

2       A    Yes.  So my wife and I purchased the property in

3    August of 2017.  At that time, we knew it needed some work

4    and some renovations, so we reached out to some architects.

5    We selected Jobi Jones as our architect and then asked her

6    who we should contact in terms of builders to do the actual

7    construction.  She gave us several names.  Review

8    Development and Jason, the defendants, were -- were two of

9    the -- were -- were -- one of the people we spoke to.  And

10   ultimately, on, sort of, her advice and speaking to

11   everyone, we selected them as the people to perform the work

12   on the property.

13      Q    Okay.  And was it your understanding that she had

14   done or worked on previous projects with Mr. Luttrell and

15   Review Development as well?

16      A    Yes, that's correct.

17      Q    And these projects were other renovations?

18      A    Yes, similar projects in size and scope to the

19   work we were having done at -- at our home.

20      Q    Okay.  And what kind of discussions were held

21   prior to entering into any sort of contract with Mr.

22   Luttrell and Review Development?

23      A    We discussed the size and scope of our project,

24   some of the work he had done similarly.  And I believe we

25   spoke to a reference that he had provided of somebody who he

1   had done work on at their home previously.  In addition, we

2   spoke to the nature of this work, just our -- our overall

3   working style, what we were looking for at the project, the

4   timelines, things like that.

5        Q    And did the cost of the project ever come up

6   during those discussions?

7        A    Yeah.  Yes, the defendant quoted us a -- a price

8   prior to signing the contract.

9        Q    Okay.  And did he make any representations

10  regarding his licenses and any of his abilities to perform

11  this type of work that would have been performed under the

12  contract?

13       A    He -- he -- certainly, the defendants said that

14  they were capable of performing the work, had performed

15  similar work in the past.  But there was no discussion of

16  licenses specifically, no, that I know.

17       Q    And did you rely upon his representations during

18  these conversations?

19       A    Yes.  Based on -- based on those discussions, we

20  believed that they were well qualified to do the work and

21  were -- were fully capable of taking on a project as we had

22  described it with them and discussed.

23       Q    Okay.  Did he point you to any social media or

24  marketing materials?

25       A    Yes.  There was the -- the -- we reviewed it on

1    the website, which had some pictures of previous projects

2    and, I think, as well perhaps Houzz or other website like

3    Profile (phonetic) that contained information about previous

4    work.

5        Q    Okay.  And did he provide you any sort of evidence

6    of insurance?

7        A    Not that I can recall, no.

8        Q    Did he ever provide you any sort of pamphlets,

9    such as an EPA lead certification or EPA renovate right's

10    letter?

11        A    No.

12        Q    Did he provide you with any DC Department of

13    Energy and Environment lead batch certification?

14        A    Not -- no, not that I can recall.

15        Q    Okay.

16        MR. CHAPMAN:  Your Honor, how do you want to do

17    exhibits?  I had sent them over -- the plaintiffs, my

18    clients, have in possession the exhibits that we're going to

19    use today.  Do you just want me to reference them?

20        THE COURT:  That's fine.  The exhibits you sent me

21    are not numbered, so --

22        MR. CHAPMAN:  Oh.  I think they're numbered at the

23    very bottom of the page.  So exhibit --

24        THE COURT:  Oh, I see.  Yep, they are.  Okay.  You

25    can just go forward.

1          MR. CHAPMAN:  Okay.

2          THE COURT:  Exhibit 1 is the contract and then --

3          MR. CHAPMAN:  Yes.

4          THE COURT:  Go ahead.  Uh-hmm, that's fine.  I

5    have them.

6          MR. CHAPMAN:  Okay.

7          BY MR. CHAPMAN:

8     Q     So Mr. Klondar, I'm just going to refer to what

9    has been pre-marked as Exhibit 1.  Do you have that document

10   in front of you?

11    A     I do, yes.

12    Q     Okay.  Can you just briefly describe what this

13   document is to us?

14    A     Exhibit 1 is the contract with Review Development.

15    Q     Okay.  And does that contract, did it ever include

16   Mr. Luttrell or Review's license number or anything like

17   that?

18    A     No, I -- I did not see a license number anywhere

19   within the document.

20    Q     Okay.  And what work was supposed to be performed

21   pursuant to this contract?

22    A     There were essentially three big blocks of work in

23   the contract and a bunch of smaller things.  The first was a

24   renovation of the kitchen in the home, just a -- basically a

25   total -- total renovation of the kitchen.

1          The second was a renovation of the primary

2     bedroom, including installing a walk-in closet and a

3     primary -- totally renovating the primary bathroom.  And

4     then there were, sort of, several other pieces of work on

5     the home, including, like, redoing the floors and updating a

6     powder room on the first floor of the house that were

7     included.  And then there's several other line items related

8     to those three big items in the contract.

9          Q    Okay.  And what was the original timeline for

10    completion for this contract?

11         A    Approximately five months was the initial

12    discussion.  The project was kicking off in November of 2017

13    and expected to conclude approximately five months later.

14         Q    Okay.  And generally, which -- you mentioned there

15    were three big projects that were supposed to occur under

16    the contract.  Do you recall the general timeline for each

17    project?

18         A    They -- they weren't really broken out separately.

19    It was all sort of one collective five-month effort.

20         Q    Okay.  And what specific work was actually done,

21    that you understand was done under the contract?

22         A    So in addition to those three items, as work

23    progressed on the house and demolition progressed, we were

24    made aware of some other issues with the house once they

25    were behind the walls.  So for instance, once they were

1   doing demolition in the primary bedroom, they noticed that

2   there had been some damage from a prior roof leak into the

3   beams in the ceiling.  And so Jason asked that we -- so he

4   recommended that we do a change order on the contract to

5   include work to repair and replace those rotted beams in the

6   ceiling.

7          In doing the work as well, the HVAC system became

8   a bit of an issue, so he recommended putting in and

9   replacing HVAC and ducting because so many of the walls had

10  already been sort of ripped out to deal with the roof issue.

11  As well, they -- the defendants recommended that because of

12  some issues at the rear of the home, the siding panels be

13  replaced as well as some electrical work be -- be completed,

14  sort of, to -- to tie out some of the challenges that --

15  that they were having throughout the house in -- in getting

16  electrical to run properly.

17      Q    Okay.  And then how long did the actual project

18  end up taking?

19      A    The work was never completed.  The defendants had

20  stopped responding to our messages by 2020.  And at that

21  point, there was still a significant amount of work

22  outstanding.  All the permits were still open.  There were

23  some -- some defects in -- in the workmanship that we were

24  working to have resolved.  And -- and that was ongoing at

25  that point.

1    Q    Okay.  And what was the original projected cost of

2  the project?

3    A    The original projected total cost was $138,520.

4    Q    Okay.  And did you end up paying Mr. Luttrell and

5  Review Development $224,710.80?

6    A    That's correct.  That's the total inclusive of all

7  the change orders and -- and other modifications.

8    Q    Okay.

9         THE COURT:  I'm sorry.  What was that total again?

10        MR. CHAPMAN:  $224,710.80.

11        THE COURT:  All right.

12        MR. CHAPMAN:  Okay.  Your Honor, after that, I'm

13  just going to move into evidence what's been pre-marked as

14  Exhibit 1.

15        THE COURT:  All right.  That will be admitted.

16                   (Plaintiffs' Exhibit Number 1 was

17                    received into evidence.)

18        MR. CHAPMAN:  Okay.

19        BY MR. CHAPMAN:

20    Q    Mr. Klondar, I want to show you what has been pre-

21  marked as Exhibit 2.  Can you just describe to me what

22  Exhibit 2 is?

23    A    Exhibit 2 is sort of the line-by-line breakdown of

24  the original cost estimates and payments made from those --

25  based on those invoices.

1       Q    Okay.  And these were invoices that were submitted

2  to you for payment from Jason Luttrell and Review

3  Development?

4       A    Yes, that's correct.

5       Q    And you ended up paying $224,710.80 over the

6  duration of the project?

7       A    Yes.  Between my wife and I, we paid -- we paid

8  that sum for a portion of the project.

9       Q    Okay.

10            MR. CHAPMAN:  Bless you.

11            THE COURT:  Thank you.  Sorry.

12            MR. CHAPMAN:  I'll now move into evidence what's

13  been pre-marked as Exhibit 2.

14            THE COURT:  All right.  Exhibit 2 will be

15  admitted.

16                         (Plaintiffs' Exhibit Number 2 was

17                          received into evidence.)

18            BY MR. CHAPMAN:

19       Q    And you kind of hit on this earlier, but just to

20  confirm, was the contract ever completed?

21       A    No, it was not.

22       Q    Okay.  And can you just briefly describe what work

23  was not completed?

24       A    Sure.  So all of the permits that were pulled for

25  the -- the work to be -- to be done combines with DCRA, none

1    of those were ever closed out, and so all of the work

2    required to close out those permits was outstanding.

3    Additionally, the work I mentioned on the back siding of the

4    home was not done properly, and so there was significant,

5    sort of, cosmetic defects happening because water was

6    getting behind the walls due to the way they were installed,

7    as was explained to us later.  So all of that needed to be

8    pulled off and new siding needed to be put on to replace

9    that.

10          In addition, there was a significant number of,

11   sort of, punch list items, paint things that weren't quite

12   right or fixtures that weren't installed quite properly that

13   just needed touched up.  And all those, sort of, minor

14   touch-up items were -- were left outstanding.

15       Q    Okay.  And you mentioned earlier that you paid to

16   have a new roof installed.  Was that new roof ever

17   installed?

18       A    Yes.  So -- so -- thank you, no.  So -- so what

19   happened was, we -- we paid -- again, Jason mentioned that

20   there was some damage to the -- to the roofing beams in the

21   house because of a leaky roof.  So one of the change orders

22   was to put a new roof on the home.

23          In approximately March of 2020, in a heavy

24   rainstorm, the roof leaked.  And so we called out a roofer

25   to figure out what the problem was, if something had -- had

1   happened.   And the roofer told us that we had not had a new

2   roof put on.   At that point, we contract -- contacted Mr.

3   Luttrell and, sort of, asked him to -- to put on a new roof.

4   He did send out a team to then do work to put on a roof,

5   which we were then told, after having someone else come out

6   and check the work, that it was done quite poorly, it was

7   not sealed properly, and that it was not really done in a --

8   a workmanlike manner.   And repairs were not economically

9   feasible based on the level of the workmanship, and so we

10   needed a second new roof put on to pull off the sort of,

11   defective one that was put on by that team.

12        Q     Okay.   And can you just generally describe how the

13   project ended?

14        A     Yes.   The -- the project ended, basically, with --

15   with the defendant no longer responding to our messages.

16   Periodically, every couple of weeks or so, we would -- I

17   would send a text message or give a call and say, hey, you

18   know, what's the status of the closeout?   Are you going to

19   be coming to -- to finish up the permits and the punch list?

20             And then sometimes, I wouldn't get a response.

21   Sometimes the response would be, he would -- or it will be a

22   few more weeks or whatever.   And that happened throughout,

23   basically, 2019 and into early 2020, at which point, there

24   was basically no more -- no more responses.   And some of the

25   workmanship issues were -- were becoming more apparent

1    and -- and he had stopped responding based on, sort of, our,

2    I think, increasing insistence that issues get resolved.

3        Q    So is it accurate to say that he abandoned the

4    project?

5        A    Yes.  That's how I would describe it.

6        Q    Okay.

7            MR. CHAPMAN:  Okay.  Your Honor, that's all I have

8    for Mr. Klondar.  I'm ready to move on to Ms. Krieger.

9    Thank you, Judge.

10           THE COURT:  All right.  Thank you, Mr. Klondar.

11   Ms. Krieger?

12           MR. KLONDAR:  Thank you, Your Honor.

13           THE COURT:  Remember, Ms. Krieger, you have been

14   sworn to tell the truth and nothing but the truth.

15           MS. KRIEGER:  Yes, Your Honor.

16           THE COURT:  Okay.  Thank you.

17       Thereupon,

18                    **SARAH ELIZABETH JUDITH KRIEGER**

19   having been called as a witness for and on behalf of the

20   Plaintiffs, and having been previously sworn by the Deputy

21   Clerk, was examined and testified as follows:

22                        **DIRECT EXAMINATION**

23           BY MR. CHAPMAN:

24       Q    Good morning, Ms. Krieger.  Can you state your

25   name for the record, please?

1      A     Yes.  My name is Sarah Elizabeth Judith Krieger.

2      Q     And where do you reside?

3      A     1419 S Street NW, S as in Sarah.

4      Q     Okay.  And that's in Washington, DC?

5      A     Yes.

6      Q     Okay.  Okay.  I want to talk to you generally

7  about the issues that resulted from the defendants' work to

8  the property.  Can you tell me when you learned that there

9  were issues with the work that was performed by the

10  defendants?

11      A     Yes.  So in approximately the fall of 2018, the

12  back siding of the home started bubbling and that's when we

13  realized there were some issues.  So we contacted the

14  defendant to fix that.

15      Q     Okay.  So this would have been prior to the

16  defendants abandoning the project?

17      A     Yes.

18      Q     Okay.  And what other concerns did you have with

19  the work that was performed?

20      A     Well, additional concerns popped up after we had

21  some additional -- or someone else come take a look at it

22  because the defendants did not come to -- to repair the

23  siding.  Initially, we called and said, you know, the

24  siding's bubbling.  Can you please come fix it?  Every time

25  it rains, there's -- more moisture's coming in.  So the

1   defendants came and repainted and said it was a paint issue.

2   But even after repainting, it continued to bubble.  And so

3   after our attempts to contact the defendants were

4   unsuccessful and we engaged another inspector and

5   contractors to come look at the house, we realized there

6   were significant additional defects in the work.

7       Q    Okay.  We'll get to that in a second.  Did the

8   defendants ever show you permits that were pulled for the

9   work?

10      A    Yes.  There were permits sitting in my front

11  window for several -- for a few years.

12      Q    Okay.  Did you believe that there were issues with

13  these permits?

14      A    At the time, I had no reason to doubt that they

15  were valid permits because I'm not an expert in this.  And

16  so I figured the permits had been pulled.  They were

17  prominently displayed in our front window.  And I didn't

18  think there was anything wrong with them at the time.

19      Q    Okay.  And did you learn later that they were not

20  accurate?

21      A    Yes.  I later learned that they were -- the term

22  "shadow permits" and that they were pulled as shadow

23  permits, and the people whose names were on the permits

24  didn't actually complete the work.  And in one case, the

25  name of the plumber, I believe, was deceased, so they -- it

1    was definitely -- that plumber was not performing work on

2    our house.  And I even -- I also later learned that some of

3    the permits were not pulled in our names as the homeowner.

4    They were pulled in the prior homeowner's names.

5         Q    Okay.  And did you later learn that much of the

6    work that the defendants performed was defective and done so

7    in an unworkmanlike manner?

8         A    Yes.

9         Q    Okay.  And can you tell me how you learned this?

10        A    Yeah.  So after we sought out a contractor to

11   evaluate the back siding and close out the permits, we

12   had -- we decided, just for our own piece of mind, after

13   learning that the back siding was not just paint, that we

14   would prefer to have the remainder of the work evaluated.

15   And there were several issues identified by the subsequent

16   contractor.

17        Q    And what were these issues?

18        A    So as we talked about, the roof was not properly

19   installed.  There was -- it didn't have flashing.  The

20   application itself was poor.  Fixing it was not really

21   economical, so we had to tear it off and replace it.  Again,

22   the permits were not closed out.  They were sitting open.

23   They eventually had to get reopened, and we had to pay for

24   that.

25             The HVAC system required some remediation as well.



1   There were also electrical and plumbing issues that were

2   outstanding.  The back stairs on the home were not properly

3   installed.  They were not to code.  They weren't sealed or

4   painted, so they were pretty much getting destroyed by

5   moisture and elements.

6          The siding that was bubbling had to be pulled off

7   because it was improperly installed and was allowing

8   moisture to seep in.  And then there were a lot of smaller

9   items throughout the house that were just cosmetic.  Some

10  were cosmetic.  Some were structural.  And a lot of code --

11  a lot of work was needed to be done to bring the house up to

12  code.

13      Q    All right.  I'm going to -- I want to show you

14  what's been pre-marked as Exhibit 3.  Do you have that in

15  front of you?

16      A    Yes, I do.

17      Q    Okay.  Can you describe to me what this is?

18      A    So this is a report that we had done when we

19  decided that we were uncomfortable with the amount of work

20  that -- the type of work that had been done, especially

21  after learning that the siding was done in an unworkmanlike

22  manner.  We had, again, for our own peace of mind, wanted a

23  second opinion on the remainder of the work to make sure it

24  was safe and up to code.  And so this is the report that we

25  had done to figure out what was going on with the rest of

1    the work in the house and the general condition of the

2    house.

3        Q    Okay.  And does this report reflect that it would

4    be estimated to cost $56,500 to cure the defects that were

5    identified?

6        A    Yes, it does.

7        Q    And does this report reflect that these defects

8    were -- stemmed from work that was performed by the

9    defendants?

10       A    Yes.

11       Q    All right.  Is there anything else you want to

12   tell me about just some of the issues that you experienced?

13       A    I mean, it obviously has negatively affected our

14   ability to live in this house because we know that a lot of

15   the work that was done was unsafe and unworkmanlike.  And

16   it's been several years and a lot more money than we ever

17   anticipated spending.

18       Q    And did you have the work that was deemed

19   defective, did you have it cured by another contractor?

20       A    Yeah.  So we're actually still in the process of

21   having it cured.  The majority of it has been fixed, but

22   there still are some remaining items because of the

23   complexity of the work.  And since the walls are now closed

24   up, it's obviously a lot harder to fix issues behind the

25   walls.

1        Q    Okay.  And have you paid to date $67,268 to cure

2  the defective work that was performed by defendants?

3        A    Yes, we have.

4        Q    Okay.  And that's still ongoing, that you

5  mentioned earlier.

6        A    Yes.

7        Q    Okay.  Have you received any sort of estimate as

8  to how much additional costs you will have to incur to cure

9  the defective work?

10       A    Yes.  We've been told that it will be

11  approximately an additional $15,000.

12       Q    Okay.  And when did you learn that?

13       A    Last week, because we knew that we had some

14  additional work outstanding, and we wanted to be able to

15  explain what scope was out -- was left, still.

16       Q    And what scope is left, still?  What still needs

17  to be done?

18       A    There's still some electrical work that needs to

19  be completed because it turned out that we actually needed

20  to have a subpanel installed, which was another several

21  thousand dollars.  There's still some paint -- some -- we

22  need to seal -- so our home has an exposed brick wall, and

23  at the bottom of it, there are some wood pieces, which we

24  never knew what they were.  It turns out they are the wood

25  beams that support our -- we live in a row home.  They

1  support our neighbor's house with whom we share a wall.  So

2  in case of fire, if that catches fire, both of our homes

3  would go up.  So we needed to seal that with, like,

4  fireproofing molding.  So we're having that completed.

5       There's some balusters on the stairs that are --

6  they're mostly there for design, but, of course, you need to

7  have something there so no one falls through.  And they're

8  not sturdy.  So they had to be nailed in and painted and

9  closed out.

10      Q    Okay.  And did the defendants market themselves as

11  having significant experience in renovations of properties

12  like your property that's at issue in this case?

13      A    Yes.  The defendant made it seem like this was

14  just a matter of course, a typical project for him, that --

15  you know, that he was experienced in -- in doing -- that he

16  and the company had -- had done projects like this before,

17  that this was not an overwhelming or unreasonable ask.  And

18  most of the change orders were done at our behest, so they

19  were recommended by the defendant.  So we -- we sort of

20  trusted that these were things that the defendants knew

21  about.

22      Q    Okay.  And do you believe that these statements

23  were misleading?

24      A    Yes, I do.

25      Q    Why is that?

1        A     It became clear that although the defendants had

2   done renovation work, the size and scope of our project was

3   far beyond their -- their capability because they just

4   seemed overwhelmed.   They were not responsive.   Since we've

5   learned about all the unworkmanlike work that was done, it's

6   clear that they either weren't aware of what the code was or

7   didn't care about it.   Yeah, so it -- it's either -- either

8   the defendants overextended themselves and became involved

9   in too many projects and were unable to keep up with them,

10  or they had no idea what they were doing.

11       Q     Okay.   And is it accurate to say that the

12  defendants accepted payment for services prior to completion

13  of the contract or finishing the work?

14       A     Yes, they did.

15       Q     Did the defendants ever provide any sort of

16  specifications along with the agreement that you entered

17  into such as construction plans or anything like that?

18       A     No.   The plans that were used were actually

19  drafted by the architect.   So all the plans that we saw were

20  architectural, and there were no building plans that the

21  defendants came up with.

22       Q     So it's accurate to say that the defendants

23  performed their work strictly based off of the architectural

24  plans and not actual construction drawings?

25       A     Yes, that is correct.



1       Q    Okay.  And we obviously hit on this earlier, but

2   the work that was performed by the defendants, it ended up

3   being defective?

4       A    Yes, it did.

5       MR. CHAPMAN:  Your Honor, I'll move into evidence

6   now what was pre-marked as Exhibit 3.

7       THE COURT:  Okay.  Exhibit 3 will be admitted.

8       (Plaintiffs' Exhibit Number 3 was

9       received into evidence.)

10      BY MR. CHAPMAN:

11      Q    Okay.  Are there any additional defects that you

12  care to mention that you're aware of, or have we kind of hit

13  on everything?

14      A    I think we've hit on everything.

15      MR. CHAPMAN:  Okay.  I think that's all I have,

16  Your Honor.  I have included as an Exhibit 4 an attorney's

17  fee affidavit for myself indicating the amount of fees that

18  have accrued during the course of the litigation.  If you

19  want to hear testimony from Ms. Krieger or Mr. Klondar

20  regarding the amounts that they have paid, we can do that.

21  But the fee affidavit includes an exhibit of the billing

22  history that was done through this litigation.

23      THE COURT:  Yeah.  No, I see that.  I mean, I

24  just -- most of it -- much of it is redacted.

25      MR. CHAPMAN:  I can provide you an unredacted --



1      THE COURT:  Do you have an unredacted version?

2      MR. CHAPMAN:  I can provide -- my office can

3  provide that, Your Honor.

4      THE COURT:  If you could do that, that would be

5  great so that when I issue my order, I know exactly what it

6  is that the attorney's fees went to.

7      MR. CHAPMAN:  Would you -- would you -- can that

8  just be sent to your chambers directly, since there's

9  obviously --

10      THE COURT:  Yeah.

11      MR. CHAPMAN:  -- privileged information included

12  in that?

13      THE COURT:  Absolutely.  You don't have to file

14  it.  Just send it straight to chambers.

15      MR. CHAPMAN:  Okay.  Understood.

16      THE COURT:  And then I'll have it.

17      MR. CHAPMAN:  Okay.  Well, with that, Your Honor,

18  I think that concludes the testimony.  I would move for

19  judgment in the amount of $67,268 plus the $15,000 in

20  anticipated costs to cure the defects, which that is $82,268

21  for the -- regarding the negligence aspect of the case.  And

22  then for violation of the Consumer Protection Procedures

23  Act, $224,710.80.

24      THE COURT:  I'm sorry.  Say that again, 200 what;

25  220 --



1    MR. CHAPMAN:  $224,710.80.  That treble damages be

2  assessed pursuant to the CPPA in the amount of $674,132.40;

3  and then that attorney's fees and costs be awarded in the

4  amount of $47,029.52.  And then I also included -- I have

5  filed this morning, I just didn't know if the Court needed

6  it -- but Exhibits 5 and 6 that were included are military

7  affidavits confirming that the defendants are not in the

8  military.

9    THE COURT:  Okay.  No, I got those.  Thank you.

10    All right.  Well, I will find that -- I will enter

11  a default judgment against Review Development and the other

12  defendant, Jason Luttrell.  I will definitely order that the

13  $82,268 be paid, since those are the costs that have been

14  incurred -- or will be incurred and have been incurred with

15  respect to the repairs that need to be made based upon the

16  defendants' failure to meet the terms of the contract it

17  signed into with the plaintiffs.

18    And you're asking for $224,000 because they didn't

19  have a -- did they have a license, or do we have information

20  about that?

21    MR. CHAPMAN:  There was information provided

22  during discovery that they -- it appears that they had a

23  license, but much of the CPPA violations -- there were other

24  CPPA violations as well that are outlined in the complaint.

25    THE COURT:  Okay.  I'll order the $224,710.80.



1   Let me review the treble damages' question.  I know that

2   that is -- that's not mandated by the Consumer Protection --

3   the DC Consumer Protection Act.

4           MR. CHAPMAN:  Understood.

5           THE COURT:  So let me review the statute and

6   review the facts of this case.  I'll listen to the testimony

7   again so that I can see if it's warranted in these

8   circumstances.

9           Also, I will award attorney's fees, but I need to

10   know what I'm awarding and how much it's going to be.  So I

11   just need to get the actual figures --

12           MR. CHAPMAN:  Correct.  We will --

13           THE COURT:  -- so I can.

14           MR. CHAPMAN:  We'll send the unredacted version as

15   soon as this is over to your chambers.

16           THE COURT:  Okay.  Wonderful.

17           All right.  So I do enter a default judgment.  The

18   final number, I'll just need to review some things, and I'll

19   get the order out to you by the end of today or tomorrow.

20           MR. CHAPMAN:  Okay.  Thank you, Your Honor, so

21   much.

22           THE COURT:  All right.

23           MR. CHAPMAN:  Do you need anything else from us?

24           THE COURT:  No.  Thank you all very much.

25           MS. KRIEGER:  Thank you very much, Your Honor.

escribers
www.escribers.net | 800-257-0885

1          MR. CHAPMAN:  Thank you, Your Honor.

2          THE COURT:  All right.

3          (Thereupon, this concludes these proceedings.)

4                         *  *  *  *  *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
<u>CERTIFICATE OF TRANSCRIBER</u>

2
     I, Tabitha L. Jones, transcriber, do hereby

3
certify that I have transcribed the proceedings had and the

4
testimony adduced in the case of SARAH E. KRIEGER TRUST, ET

5
AL. v. REVIEW DEVELOPMENT, LLC, ET AL., Docket Number:  2020

6
CAB 004714 in said Court, on the 31st day of January, 2022.

7
     I further certify that the foregoing 28 pages

8
constitute the official transcript of said proceedings as

9
transcribed from audio recording to the best of my ability.

10
     In witness whereof, I have hereto subscribed my

11
name, this 2nd day of October, 2023.

12

13

14

15

16
TRANSCRIBER

17

18

19

20

21

22

23

24

25

# EXHIBIT "C"

Filed
D.C. Superior Court
01/31/2022 13:39PM
Clerk of the Court

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

| | |
|---|---|
| **SARH E. KRIEGER TRUST et al.,**<br><br>     **Plaintiff,**<br><br>**v.**<br><br>**REVIEW DEVELOPMENT, LLC et al.,**<br><br>     **Defendant.** | **2020 CA  004714 B**<br><br>**Judge Yvonne Williams** |

<u>**ORDER GRANTING MOTION FOR DEFAULT JUDGMENT**</u>

     Before the Court is Plaintiffs' Motion for Default Judgment filed on November 29, 2021.

Defendants, Review Development LLC and Jason Luttrell, have not responded to the Motion or

appeared in Court since an October 22, 2021 status hearing. For the following reasons, the Motion

shall be **GRANTED**.

     On November 17, 2020, Plaintiffs initiated this lawsuit which involves a dispute over a

home renovation project. Per the Complaint, the Plaintiffs hired Review Development LLC

(Review) to renovate their property. ¶ 9. Mr. Luttrell has controlling ownership of Review. ¶ 31.

Plaintiffs allege that prior to entering the Agreement, Review and Mr. Luttrell represented that

they were properly licensed and capable contractors, but their representations were false and relied

upon in entry of the contract in violation of the D.C. Consumer Protection Act. Compl. ¶ 11. In

addition, the project was not completed. ¶ 22. The Plaintiffs also allege there were several defects

in the Defendants' work. *Id.* ¶ 27. Defendants filed a counterclaim, but have not been responsive

since a status hearing on October 22, 2021. The Court entered a default against Defendant on

November 19, 2021. On November 29, 2021, Plaintiffs filed the instant Motion for Default

Judgment. Defendants did not oppose the Motion. Plaintiffs filed their documentation supporting

their request for damages on January 28, 2022. The Court held an Ex Parte Proof Hearing on January 31st, 2022 and granted the instant Motion.

Rule 12-I(e) permits, but does not require, a court to treat unopposed motions as conceded. For a substantive motion like this one, "[t]he general principle . . . is that [a conceded motion provision] may properly be utilized only where the movant has established a prima facie entitlement to relief." *District of Columbia v. Davis*, 811 A.2d 800, 804 (D.C. 2002); *see Nat'l Voter Contact, Inc. v. Versace*, 511 A.2d 393, 397 (D.C. 1986). Thus, even if a substantive motion is not opposed in whole or in part, the Court has a duty to consider its merits—but not with the degree of scrutiny that the Court would apply if the non-moving party had actually objected.

Here, based on its examination of the record, the Court concludes that Plaintiffs have established a prima facie entitlement to the relief it seeks. "[T]he entry of a default operates as an admission by the defaulting party that there are no issues of liability, leaving only damages to be determined." *See Luna v. A.E. Eng'g Servs., LLC*, 938 A.2d 744, 750 (D.C. 2007) (quotations omitted). "[A] defendant's default does not in itself warrant the court in entering a default judgment. There must be a sufficient basis *in the pleadings* for the judgment entered." *Oliver v. Mustafa*, 929 A.2d 873, 877-78 (D.C. 2007) (emphasis in original) (quotations omitted). By failing to respond to the Motion for Default Judgment, Defendants concede the allegations, and Plaintiffs have made a prima facie case that they are entitled to damages in the amount of $224,710.80 for violation of the District of Columbia Consumer Protection Act, $82,268.00 for actual damages and treble damages in the amount of $248,034.00. The court will also award $47,029.52 for attorney's fees and costs.

Accordingly, it is on this 31st day of January 2022, hereby,

**ORDERED** that the Motion for Default Judgment shall be **GRANTED**; and it is further

**ORDERED** that default judgment shall be entered in favor of Plaintiffs Sarah E. Krieger Trust, Sarah E. Krieger, and Evan Klondar, and against Defendants Review Development, LLC and Jason Luttrell; and it is further

**ORDERED** that the Court awards $555,012.80 to Plaintiffs Sarah E. Krieger Trust, Sarah E. Krieger, and Evan Klondar against Defendants Review Development, LLC and Jason Luttrell; and it is further

**ORDERED** that the Defendants shall pay to Plaintiff's counsel $47,029.52 in attorney's fees and costs; and it is further

**ORDERED** that this case is **CLOSED**.

**IT IS SO ORDERED**.

Judge Yvonne Williams

Date: January 31, 2022

Copies to:

Zachary L. Chapman
Christopher Glaser
*Counsel for Plaintiff*

Copies mailed to:

Review Development, LLC
Jason Luttrell
6311 5th Street NW
Washington, DC 20011
*Defendant*